Nos. 15-5880, 15-5961, 15-5978
———————————————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT
———————————————————

APRIL MILLER, Ph.D; KAREN ANN ROBERTS; SHANTEL BURKE;
STEPHEN NAPIER; JODY FERNANDEZ; KEVIN HOLLOWAY; L. AARON
SKAGGS; and BARRY SPARTMAN,

Plaintiffs-Appellees,

*v.*

KIM DAVIS, individually,

Defendant-Third-Party Plaintiff-Appellant,

*v.*

STEVEN L. BESHEAR, in his official capacity as Governor of Kentucky, and
WAYNE ONKST, in his official capacity as State Librarian and Commissioner,
Kentucky Department for Libraries and Archives,

Third-Party Defendants-Appellees.
———————————————————

On Appeal From The United States District Court
For The Eastern District of Kentucky
In Case No. 15-cv-00044 Before The Honorable David L. Bunning
———————————————————

## CONSOLIDATED OPENING BRIEF FOR APPELLANT KIM DAVIS
———————————————————

*(continued on next page)*

(*continued from prior page*)

A.C. Donahue
DONAHUE LAW GROUP, P.S.C.
P.O. Box 659
Somerset, Kentucky 42502
(606) 677-2741
ACDonahue@DonahueLawGroup.com

Mathew D. Staver, *Counsel of Record*
Horatio G. Mihet
Roger K. Gannam
Jonathan D. Christman
LIBERTY COUNSEL
P.O. Box 540774
Orlando, Florida 32854
(407) 875-1776
court@lc.org / hmihet@lc.org /
rgannam@lc.org / jchristman@lc.org

*Counsel for Appellant Kim Davis*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ............................................................v

STATEMENT REGARDING ORAL ARGUMENT .......................... xiv

INTRODUCTION ......................................................................1

JURISDICTIONAL STATEMENT .................................................3

STATEMENT OF ISSUES ...........................................................5

STATEMENT OF THE CASE........................................................6

    A.   Kentucky Marriage Licensing Scheme Before *Obergefell* ..................6

    B.   Kentucky Governor's SSM Mandate ....................................9

    C.   Davis' Sincerely-Held Religious Beliefs About Marriage .................11

    D.   The Lawsuit Against Davis .................................................13

    E.   The Injunction .........................................................16

    F.   The Expanded Injunction .................................................21

    G.   The Incarceration of Davis.................................................23

    H.   Davis' Release From Imprisonment And Post-Release Accommodation From The SSM Mandate .........................25

SUMMARY OF ARGUMENT ......................................................27

STANDARD OF REVIEW ..........................................................30

ARGUMENT ..........................................................................31

I.   The District Court Erred In Granting The August 12, 2015 Injunction Against Davis...........................................31

i

**TABLE OF CONTENTS**
(continued)

<u>**Page**</u>

A.    The District Court Wrongly Held That Plaintiffs Demonstrated A Direct And Substantial Burden On Their Right To Marry Under The Fourteenth Amendment ................................................................. 31

B.    The District Court Wrongly Held That Davis Will Not Suffer Irreparable Harm To Her Religious Freedom .................................... 43

    1.    The First Amendment And Kentucky RFRA Apply To Davis As A Person ........................................................................ 43

    2.    The SSM Mandate Constitutes Government Action ............... 49

    3.    The District Court Adopted An Erroneous Substantial Burden Analysis ...................................................................... 53

    4.    The SSM Mandate Cannot Survive Strict Scrutiny ................. 60

        a.    Application Of The SSM Mandate Without Religious Accommodation For Davis Does Not Serve A Compelling Governmental Interest ................................ 61

        b.    Many Less Restrictive Alternatives Are Available ....... 68

C.    Public Interest Favors Protection Of First Amendment Rights Generally And Interim Religious Accommodation For Davis Under The Circumstances Of This Case ...................................................... 72

II.    The District Court Erred In Practically Denying Davis' Request For Preliminary Injunctive Relief Against The State Defendants .....................73

III.    The District Court Erred In Granting The September 3, 2015 Expanded Injunction Against Davis ..............................................................................75

A.    The District Court Had No Jurisdiction To Expand The Original Injunction While It Was On Appeal To This Court ........................... 75

B.    The District Court Violated Davis' Due Process Rights By Granting A New Injunction Without More Than Same-Day Notice ................... 78

# TABLE OF CONTENTS
(continued)

**Page**

IV.   The District Court Committed An Abuse Of Discretion In Its September 3, 2015 Contempt Order .................................................................................79

    A.   Reversal Of The Injunction Warrants Reversal Of The Contempt Order................................................................................................ 80

    B.   The Contempt Order Eviscerated Davis' Constitutional Due Process Rights................................................................................................ 80

    C.   The District Court's Contempt Order Erroneously Discarded Davis' Rights Under The Federal RFRA.................................................... 83

    D.   The District Court Unconstitutionally Commandeered The Province And Affairs Of A State Office Run By A Publicly Elected Official................................................................................................ 86

CONCLUSION ....................................................................................................89

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS ..........90

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS .......Add. 1

CONSTITUTIONAL AND STATUTORY PROVISIONS............................Add. 6

    U.S. CONST. amend I.................................................................Add. 6

    U.S. CONST. amend XIV............................................................Add. 6

    KY. CONST. § 1........................................................................Add. 6

    KY. CONST. § 5........................................................................Add. 7

    KY. CONST. § 233A..................................................................Add. 8

    42 U.S.C. § 2000bb-1. ..............................................................Add. 8

    42 U.S.C. § 2000bb-2 ...............................................................Add. 9

iii

## TABLE OF CONTENTS
### (continued)

**<u>Page</u>**

KY. REV. STAT. § 402.005 ...................................................................Add. 10

KY. REV. STAT. § 402.080 ...................................................................Add. 10

KY. REV. STAT. § 402.100 ...................................................................Add. 11

KY. REV. STAT. § 402.110 ...................................................................Add. 13

KY. REV. STAT. § 402.230 ...................................................................Add. 14

KY. REV. STAT. § 402.240 ...................................................................Add. 14

KY. REV. STAT. § 402.990 ...................................................................Add. 15

KY. REV. STAT. § 446.350 ...................................................................Add. 16

CERTIFICATE OF SERVICE

iv

# TABLE OF AUTHORITIES

**Page**

## Cases

*ACLU v. Mercer Cnty., Ky.*,
    432 F.3d 624 (6th Cir. 2005) ...............................................................65

*Addington v. Texas*,
    441 U.S. 418 (1979)..........................................................................83

*Am. Town Ctr. v. Hall 83 Assocs.*,
    912 F.2d 104 (6th Cir. 1990) ......................................................75, 76

*Bays v. City of Fairborn*,
    668 F.3d 814 (6th Cir. 2012) ......................................................30, 31

*Blaylock v. Checker Oil Co.*,
    547 F.2d 962 (6th Cir. 1976) ........................................................5, 80

*Bloom v. Illinois*,
    391 U.S. 194 (1968).........................................................................79

*Borough of Duryea, Pa. v. Guarnieri*,
    131 S.Ct. 2488 (2011).................................................................46, 47

*Burwell v. Hobby Lobby Stores, Inc.*,
    134 S.Ct. 2751 (2014)...............................................................*passim*

*Cady v. Arenac Cnty.*,
    574 F.3d 334 (6th Cir. 2009) ..........................................................74

*Carson v. Am. Brands, Inc.*,
    450 U.S. 79 (1981)............................................................................4

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)...........................................................60, 61, 68

## TABLE OF AUTHORITIES
(continued)

**Page**

*City of Boerne v. Flores,*
    521 U.S. 507 (1997)..................................................................43, 44

*City of Cookeville, Tenn. v. Upper Cumberland Elec. Membership Corp.,*
    484 F.3d 380 (6th Cir. 2007) ....................................................75, 76

*Cooke v. U.S.,*
    267 U.S. 517 (1925)..........................................................................79

*Connection Distributing Co. v. Reno,*
    154 F.3d 281 (6th Cir. 1998) ..........................................................43

*Consolidation Coal Co. v. Local Union No. 1784,*
    514 F.2d 763 (6th Cir. 1975) ..........................................................81

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos,*
    483 U.S. 327 (1987)..........................................................................65

*Cousins v. Bray,*
    137 Fed. App'x 755 (6th Cir. 2005) .................................................5

*Curto v. City of Harper Woods,*
    954 F.2d 1237 (6th Cir. 1992) ........................................................40

*Dayton Area Visually Impaired Persons, Inc. v. Fisher,*
    70 F.3d 1474 (6th Cir. 1995) ..........................................................72

*DeBoer v. Snyder,*
    772 F.3d 388 (6th Cir. 2014) ..........................................................35

*Elec. Workers Pension Trust Fund of Local Union #58 v. Gary's Elec. Serv. Co.,*
    340 F.3d 373 (6th Cir. 2003) ..........................................................31

*Elrod v. Burns,*
    427 U.S. 347 (1976)..........................................................................43

## TABLE OF AUTHORITIES
(continued)

<u>Page</u>

*Employment Div., Dep't of Human Resources of Oregon v. Smith*,
  494 U.S. 872 (1990)................................................................................44

*Ex Parte Young*,
  209 U.S. 123 (1908)...............................................................................74

*Foucha v. Louisiana*,
  504 U.S. 71 (1992).................................................................................83

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006)...............................................................................46

*Garrison v. Cassens*,
  334 F.3d 528 (6th Cir. 2003) ................................................................80

*Gillis v. U.S. Dep't of Health & Human Servs.*,
  759 F.2d 565 (6th Cir. 1985) ..................................................................4

*Gompers v. Buck's Stove & Range Co.*,
  221 U.S. 418 (1911)...............................................................................80

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
  546 U.S. 418 (2006).........................................................61, 62, 63, 64

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers
  Local No. 70 of Alameda Cnty.*, 415 U.S. 423 (1974)..................78, 79

*Griggs v. Provident Consumer Discount Co.*,
  459 U.S. 56 (1982).................................................................................75

*Haight v. Thompson*,
  763 F.3d 554 (6th Cir. 2014) .......................................57, 58, 63, 70

*Hobbie v. Unemployment Appeals Comm'n of Fla.*,
  480 U.S. 136 (1987)...............................................................................65

# TABLE OF AUTHORITIES
(continued)

**Page**

*Holt v. Hobbs*,
135 S.Ct. 853 (2015)...........................................................................57

*Hunter v. Hamilton Cnty. Bd. of Elections*,
635 F.3d 219 (6th Cir. 2011) ..............................................................78

*Hutto v. Finney*,
437 U.S. 678 (1978)............................................................................87

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
512 U.S. 821 (1994)..............................................................79, 80, 81

*Jackson v. Ylst*,
921 F.2d 882 (9th Cir. 1990) ..............................................................74

*Kalosho v. Kapture*,
868 F. Supp. 882 (E.D. Mich. 1994) ..................................................74

*Kendrick v. Bland*,
740 F.2d 432 (6th Cir. 1984) ..............................................................87

*Lane v. Franks*,
134 S.Ct. 2369 (2014).........................................................................46

*Liberty Coins, LLC v. Goodman*,
748 F.3d 682 (6th Cir. 2014) ..............................................................31

*Loving v. Virginia*,
388 U.S. 1 (1968)................................................................................36

*Lugar v. Edmonson Oil Co., Inc.*,
457 U.S. 922 (1982)............................................................................50

*Milliken v. Bradley*,
433 U.S. 267 (1977)............................................................................86

# TABLE OF AUTHORITIES
(continued)

**Page**

*Montgomery v. Carr*,
   101 F.3d 1117 (6th Cir. 1996) ...................................................32, 33

*N.L.R.B. v. Cincinnati Bronze, Inc.*,
   829 F.2d 585 (6th Cir. 1987) .....................................................75, 81

*Newsom v. Norris*,
   888 F.2d 371 (6th Cir. 1989) ...........................................................43

*O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*,
   389 F.3d 973 (10th Cir. 2004) .........................................................72

*Obergefell v. Hodges*,
   135 S.Ct. 2584 (2015)...............................................................*passim*

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't*,
   305 F.3d 566 (6th Cir. 2002) ...........................................................30

*Prater v. City of Burnside, Ky.*,
   289 F.3d 417 (6th Cir. 2002) ...........................................................44

*S. Milk Sales, Inc. v. Martin*,
   924 F.2d 98 (6th Cir. 1991) .............................................................72

*Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*,
   801 F.3d 927 (8th Cir. 2015) .....................................................55, 56

*Sherbert v. Verner*,
   374 U.S. 398 (1963)........................................................................57

*Spallone v. U.S.*,
   493 U.S. 265 (1990)........................................................................87

*Spruyette v. Walters*,
   753 F.2d 498 (6th Cir. 1985) ...........................................................74

# TABLE OF AUTHORITIES
(continued)

**Page**

*Thomas v. Review Bd. of Indiana Employment Security Div.*,
450 U.S. 707 (1981)............................................................................53

*Turner v. Safley*,
482 U.S. 78 (1987).............................................................................36

*U.S. v. Ali*,
682 F.3d 705 (8th Cir. 2012) ......................................................31, 84

*U.S. v. Holloway*,
740 F.2d 1373 (6th Cir. 1984) ..........................................................76

*U.S. v. Playboy Entm't Group, Inc.*,
529 U.S. 803 (2000)...........................................................................61

*U.S. v. State of Mich.*,
Nos. 94-2391, 95-1258, 1995 WL 469430 (6th Cir. 1995)................75

*U.S. v. United Mine Workers of Am.*,
330 U.S. 258 (1947)...........................................................................80

*U.S. v. Wilson*,
421 U.S. 309 (1975)...........................................................................79

*U.S. v. Windsor*,
133 S.Ct. 2675 (2013).................................................................34, 37

*Vaughn v. Lawrenceburg Power Sys.*,
269 F.3d 703 (6th Cir. 2001) ............................................................33

*Workman v. Tate*,
958 F.2d 164 (6th Cir. 1992) ............................................................76

*Zablocki v. Redhail*,
434 U.S. 374 (1978).....................................................................32, 36

## TABLE OF AUTHORITIES
(continued)

**Page**

**Constitutional Provisions**

*Federal*

U.S. CONST. amend I ....................................................................*passim*

U.S. CONST. amend XI ...........................................................41, 74

U.S. CONST. amend XIV ...............................................................*passim*

*State*

KY. CONST. Preamble .......................................................................40

KY. CONST. § 1 ..................................................................................45

KY. CONST. § 5 ...........................................................................40, 45

KY. CONST. § 66 ...............................................................................87

KY. CONST. § 67 ...............................................................................87

KY. CONST. § 68 ...............................................................................87

KY. CONST. § 80 ...............................................................................51

KY. CONST. § 233A .............................................................................6

**Statutes**

*Federal*

18 U.S.C. § 401 ...................................................................................81

28 U.S.C. § 1292 ..............................................................................3, 4

28 U.S.C. § 1331 .................................................................................3

# TABLE OF AUTHORITIES
(continued)

**Page**

28 U.S.C. § 1367 ................................................................................3

42 U.S.C. § 1983 ................................................................................3

42 U.S.C. § 2000bb ..........................................................................64

42 U.S.C. § 2000bb-1 .........................................................43, 61, 64, 84

42 U.S.C. § 2000bb-2 .......................................................................84

### *State*

Ky. Rev. Stat. § 12.028 ....................................................................70

Ky. Rev. Stat. § 150.195 ..................................................................69

Ky. Rev. Stat. § 171.130 ....................................................................7

Ky. Rev. Stat. § 402.005 .........................................................6, 7, 50

Ky. Rev. Stat. § 402.010 ....................................................................9

Ky. Rev. Stat. § 402.020 .................................................................9, 51

Ky. Rev. Stat. § 402.050 ...............................................................37, 39

Ky. Rev. Stat. § 402.080 ..........................................................*passim*

Ky. Rev. Stat. § 402.100 .......................................................7, 8, 37, 51

Ky. Rev. Stat. § 402.105 ..................................................................51

Ky. Rev. Stat. § 402.110 .............................................................7, 51

Ky. Rev. Stat. § 402.230 .......................................................37, 38, 39, 51

Ky. Rev. Stat. § 402.240 ..................................................................70

# TABLE OF AUTHORITIES
(continued)

**Page**

KY. REV. STAT. § 402.990 ................................................................9, 51

KY. REV. STAT. § 446.010 ......................................................................45

KY. REV. STAT. § 446.030 ......................................................................45

KY. REV. STAT. § 446.090 ......................................................................45

KY. REV. STAT. § 446.140 ......................................................................45

KY. REV. STAT. § 446.350 .................................................................*passim*

MD. CODE ANN., FAM. LAW § 2-401 .....................................................37

MICH. COMP. LAWS § 551.101................................................................38

MICH. COMP. LAWS § 551.103a..............................................................38

MINN. STAT. § 517.07..............................................................................38

MINN. STAT. § 517.08..............................................................................38

N.C. GEN. STAT. § 51-5.5 ............................................................35, 69, 73

OHIO REV. CODE ANN. § 3101.05...........................................................38

TENN. CODE ANN. § 36-3-103 ................................................................38

UTAH S.B. 297 (2015 Gen. Sess.)............................................................73

## Rules

Fed. R. Civ. P. 6(c)..................................................................................78

Fed. R. Civ. P. 62(c)................................................................................76

Fed. R. Civ. P. 65(a)................................................................................78

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellant Kim Davis ("Davis"), the elected County Clerk of Rowan County, Kentucky, respectfully requests oral argument due to the weighty constitutional and statutory issues at stake in this case of first impression. This case arises in the wake of the Supreme Court's decision in *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015), and presents an example of what one dissenting opinion in *Obergefell* accurately predicted as the "inevitable" conflict instigated by the majority opinion in *Obergefell*, as individuals "are confronted with demands to participate in and endorse civil marriages between same-sex couples." *Obergefell*, 135 S.Ct. at 2638 (Thomas, J., dissenting).

From the outset of this case, Davis has consistently argued that there were multiple alternatives by which her undisputed sincerely-held religious beliefs protected by the Kentucky Religious Freedom Restoration Act and the First Amendment, both of which predate and survive *Obergefell*, could be accommodated while simultaneously ensuring individuals who are qualified to marry under Kentucky law may obtain valid marriage licenses in Rowan County. But, in a rush to judgment that promoted expediency over due process, the district court's original injunction in this dispute tramples upon Davis' religious rights in subjugation to Plaintiffs' "preference" for a marriage license authorized by a particular person in a particular county. Under the circumstances here, Plaintiffs' purported rights should

not trump Davis' undisputed sincerely-held religious beliefs. Because this dispute involves core constitutional and statutory freedoms, and a complex and untested interplay between them, there is a significant public interest in resolving this conflict within a legal framework that can be applied to other, and likely, future conflicts. Davis therefore respectfully submits that oral argument would assist the Court in this appeal.

## INTRODUCTION

Things are not always what they seem on first view. This case is not about whom a person may marry under Kentucky law. No statewide ban is preventing any individual from marrying whom they want to marry. This case is not about whether Kentucky will (or must) recognize same-sex "marriage" ("SSM"). On June 26, 2015, the Kentucky Governor unambiguously declared that Kentucky will. This case is also not about whether Plaintiffs could obtain a Kentucky marriage license. They can, and always could. Marriage licenses—including licenses issued to same-sex couples—are and have been readily available across Kentucky in more than 130 locations, and Plaintiffs are indisputably financially and physically able to drive to those locations to secure a license, as shown by their 60-mile and 100-mile trips to attend Court hearings in this case.

Neither is this case about an impotent Kentucky Governor who has no control over Kentucky marriage law, sets no Kentucky marriage policy, and possesses no authority to provide a simple religious accommodation to a single county clerk. Instead, in the same gubernatorial proclamation mentioned above, the Kentucky Governor issued a directive ordering all Kentucky county clerks to participate in SSM and authorize SSM licenses, without exception and regardless of their sincerely-held beliefs (the "SSM Mandate"). If unwilling to abandon their beliefs, they were told to resign. Yet the Kentucky Governor has now effectively approved

1

the very accommodation to the SSM Mandate he previously declared he had no power to grant.

Nor is this case about a county clerk who wants to re-litigate in federal court the nascent *Obergefell v. Hodges* decision, 135 S.Ct. 2584 (2015), or to absolutely prevent same-sex couples from receiving a marriage license in Kentucky. To the contrary, as county clerk, Kim Davis ("Davis") has indisputably treated all couples—whether same-sex or opposite sex—the same. During her nearly 30 years of service in the Rowan County clerk's office, she has never once raised a religious conscience objection to performing a function in the clerk's office, until now. Davis, like many other reasonable and sincere persons, holds in good faith an undisputed religious conviction that marriage is a union between a man and a woman, only. Thus, in her belief, SSM is not, in fact, marriage. She therefore cannot issue a marriage license to a same-sex couple that bears her name, other personal identifiers, and authorization, as the SSM Mandate required. This act of validation of the proposed union violates her religious freedom protected by the Kentucky Religious Freedom Restoration Act and the United States and Kentucky Constitutions, which predate and survive *Obergefell*. Nothing in the *Obergefell* decision compels States to accomplish recognition (or equal treatment) of SSM by invading and trampling upon the conscience of individual county clerks, as occurred with the SSM Mandate.

Nor does this case present a mutually exclusive "winner take all" choice between two extremes proffering "all or nothing" approaches between SSM on one hand, and religious liberty on the other hand. This case need not be resolved by picking one set of rights to the outright exclusion of another. While Plaintiffs continue to demand unrelenting adherence and submission to their orthodoxy of no accommodation whatsoever, Davis has consistently shown from the outset of this case that there are multiple alternatives by which her undisputed sincerely-held religious beliefs about marriage can be accommodated, while simultaneously allowing individuals to obtain valid marriage licenses, even in Rowan County. If Davis' religious rights cannot be accommodated under the circumstances of this case, then publicly elected officials have no real religious freedom when they take office.

## JURISDICTIONAL STATEMENT

The district court exercised jurisdiction under 42 U.S.C. § 1983, 28 U.S.C. § 1331, and 28 U.S.C. § 1367. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a).

On August 12, 2015, the district court entered a preliminary injunction against Davis in her official capacity as Rowan County clerk. R.43, Inj. (hereinafter, "Injunction"), PgID.1146-1173. On that same day, Davis filed a notice of appeal of the Injunction. R.44, Notice of Appeal, PgID.1174-1206.

On August 25, 2015, the district court entered an order effectively denying Davis' motion for preliminary injunction against third-party defendants Kentucky Governor Steven L. Beshear ("Gov. Beshear") and State Librarian and Commissioner Wayne Onkst ("Commr. Onkst") (together, "State Defendants"). R.58, Order (8/25/2015), PgID.1289. On August 31, 2015, Davis filed a notice of appeal of this effective denial of the requested injunction, pursuant to 28 U.S.C. § 1292(a) and applicable precedent holding that a "practical denial" of an injunction is immediately appealable. R.66, Notice of Appeal, PgID.1471-1476; *see also Gillis v. U.S. Dep't of Health & Human Servs.*, 759 F.2d 565, 567 (6th Cir. 1985); *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981). A motions panel of this Court denied without prejudice a motion to dismiss Davis' appeal of this order, concluding that the order "has the practical effect of denying immediate injunctive relief to Davis." Case No. 15-5961, Doc. 37-1 at 2.

On September 3, 2015, while the Injunction was on appeal, the district court granted a new injunction that expanded the Injunction pending before this Court. R.74, Exp. Inj. (hereinafter, "Expanded Injunction"), PgID.1557. On September 8, 2015, Davis filed a notice of appeal of the Expanded Injunction. R.82, Notice of Appeal, PgID.1785-1790.

On September 3, 2015, the district court entered an order finding Davis in contempt of the Injunction and ordering that Davis be incarcerated. R.75, Contempt

Order, PgID.1558-1559. On September 8, 2015, Davis filed a notice of appeal of this contempt order. R.83, Notice of Appeal, PgID.1791-1797. Although civil contempt orders usually are not immediately reviewable (unlike criminal contempt orders), this Court permits immediate appeals from civil contempt orders arising from challenged preliminary injunction orders already on appeal. *Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 965-66 (6th Cir. 1976); *Cousins v. Bray*, 137 Fed. App'x 755, 756 (6th Cir. 2005).

On October 1, 2015, this Court consolidated the foregoing appeals for briefing and submission. Doc. 54-1.

## STATEMENT OF ISSUES

1.    Whether the district court erred in granting the Injunction against Davis, when Plaintiffs suffered no direct and substantial burden on their right to marry under the Fourteenth Amendment since they are physically and financially able to obtain Kentucky marriage licenses from more than 130 locations throughout the state, and Davis' religious freedom is substantially burdened and irreparably harmed by the forced authorization and approval of SSM licenses in derogation of her undisputed sincerely-held religious beliefs protected by the Kentucky Religious Freedom Restoration Act and the United States and Kentucky Constitutions, while many less restrictive alternatives to the SSM Mandate are available.

2.      Whether the district court erred in practically denying Davis' request for injunctive relief against the State Defendants, in which she sought a reasonable religious accommodation from the SSM Mandate under the Kentucky Religious Freedom Restoration Act and the United States and Kentucky Constitutions.

3.      Whether the district court erred in expanding the Injunction while it was on appeal to this Court to include indisputably new relief that was neither previously requested nor covered by the original Injunction, and doing so without more than same-day notice and without taking any evidence.

4.      Whether the district court erred in finding Davis in contempt and ordering her to be incarcerated without affording her appropriate due process, violating her rights under the Federal Religious Freedom Restoration Act, and discarding fundamental principles of federalism and comity by commandeering a state office run by a publicly elected official.

## STATEMENT OF THE CASE

### A.    Kentucky Marriage Licensing Scheme Before *Obergefell*.

Under Kentucky's democratically-approved constitution and statutes, "marriage" is defined as the union between one man and one woman. KY. CONST. § 233A ("Only a marriage between one man and one woman shall be valid or recognized as a marriage in Kentucky."); KY. REV. STAT. § 402.005 ("'[M]arriage' refers only to the civil status, condition, or relation of one (1) man and one (1)

6

woman united in law for life, for the discharge to each other and the community of the duties legally incumbent upon those whose association is founded on the distinction of sex."). The entire Kentucky marriage licensing scheme set forth in Chapter 402 of Kentucky's revised statutes turns on this definition of marriage.

Under democratically-approved Kentucky marriage law enacted with this understanding of marriage, individuals may obtain a marriage license from the county clerk in any of Kentucky's 120 counties, **irrespective of their county of residence**. KY. REV. STAT. § 402.080; R.34, Verified Third-Party Complaint (hereinafter, "VTC"), PgID.748.[1] This marriage licensing scheme directs each county clerk to use "the form proscribed by the Department for Libraries and Archives [KDLA] when issuing a marriage license," KY. REV. STAT. § 402.100; R.34, VTC, PgID.748, and further requires that "[t]he form of marriage license prescribed in KRS 402.100 shall be uniform throughout this state." KY. REV. STAT. § 402.110; R.34, VTC, PgID.748. The KDLA is an executive branch department "headed by a commissioner [Commr. Onkst]" who "shall be appointed by and serve at the pleasure of the Governor." KY. REV. STAT. § 171.130; R.34, VTC, PgID.747.

Under Kentucky marriage law enacted before *Obergefell*, the specific KDLA-approved form "shall consist of" a marriage license that included an "authorization

---

[1]    Because some counties have multiple branch offices, there are approximately **137 marriage licensing locations** throughout Kentucky. R.34, VTC, PgID.748.

statement of the county clerk issuing the license" and "[t]he date and place the license is issued, and the signature of the county clerk or deputy clerk issuing the license." KY. REV. STAT. § 402.100(1); R.34, VTC, PgID.748-749. This form "shall" also include a marriage certificate which, upon solemnization, was to be returned to the county clerk's office and provide certain "information as recorded on the license authorizing the marriage," including "**the name of the county clerk under whose authority the license was issued**, and the county in which the license was issued." KY. REV. STAT. § 402.100(3) (emphasis added); R.34, VTC, PgID.748-749.

Thus, pursuant to this marriage licensing scheme enacted before *Obergefell*, each and every marriage license was to be issued by, in the name of, and on the authorization of an elected county clerk. Each clerk must include the clerk's own name **<u>four</u>** times on any marriage licenses the clerk signs personally, but **<u>no less than two times</u>** when the clerk's issuing authority is exercised by a deputy clerk. R.34-1, Pre-*Obergefell* Marriage License, PgID.778. No marriage license could be issued in any county without the clerk's authorization and imprimatur. R.34, VTC, PgID.749. The KDLA-approved form described the act being authorized and licensed as "marriage" at six places, and further specified that the county clerk is authorizing the individuals to "join together" in "the state of matrimony." *Id.* at PgID.748-749; *see also* R.34-1, Pre-*Obergefell* Marriage License, PgID.778.

As a general matter, Kentucky statutes permit the establishment of a marriage between individuals who are over the age of 18, mentally competent, not closely related to one another, and presently unmarried. KY. REV. STAT. §§ 402.010, 402.020(1)(a)-(f). Under these statutes, individuals may not marry a person of the same sex. KY. REV. STAT. § 402.020(1)(d). A county clerk who issues a marriage license to a couple not eligible to marry under Kentucky's statutes is guilty of a misdemeanor offense and subject to removal from office. KY. REV. STAT. § 402.990(6), (7).

**B.      Kentucky Governor's SSM Mandate.**

On June 26, 2015, only moments after the Supreme Court decided *Obergefell*, and without permitting any legislative response or action, Gov. Beshear issued a directive to all Kentucky county clerks (hereinafter, "SSM Mandate") ordering that "[e]ffective today, Kentucky will recognize as valid all same sex marriages performed in other states and in Kentucky." R.1-3, Beshear Letter, PgID.26. In this SSM Mandate, Gov. Beshear further commanded that "Kentucky . . . must license and recognize the marriages of same-sex couples," and directed county clerks that "[n]ow that same-sex couples are entitled to the issuance of a marriage license, the [KDLA] will be sending a gender-neutral form to you today, along with instructions for its use." *Id.* The KDLA subsequently provided this new marriage form to county clerks, including Davis. R.34, VTC, PgID.753-754. The form retained all of the

9

references to "marriage," as well as the name, signature and authorization requirements of the county clerk. *Id.*; *see also* R.34-1, Pre-*Obergefell* Marriage License, PgID.778; R.34-4, Post-*Obergefell* Marriage License, PgID.784.

Following Gov. Beshear's decree, county clerks across Kentucky began issuing SSM licenses, with almost no exception. R.34, VTC, PgID.754. According to Gov. Beshear, "government officials in Kentucky . . . must recognize same-sex marriages as valid and allow them to take place," and "[s]ame-sex couples are now being married in Kentucky and such marriages from other states are now being recognized under Kentucky law." *Id.* In these same pronouncements, Gov. Beshear stated that the "overwhelming majority of county clerks" are "iss[uing] marriage licenses regardless of gender" and only "two or three" county clerks (of 120) were "refusing" to issue such licenses due to their "personal beliefs" and "personal feelings." *Id.* In subsequent pronouncements, Gov. Beshear maintained that county clerks must issue marriage licenses, including SSM licenses, despite their "own personal beliefs." *Id.* For Gov. Beshear, the only options available to county clerks who are subject to the SSM Mandate but oppose SSM are (1) issue the licenses against their "personal convictions," or (2) resign. *Id.* at PgID.754, 757.[2]

_____

[2]    Notably, Gov. Beshear did not provide the same ultimatum to Kentucky Attorney General Jack Conway ("Atty. Gen. Conway") when he refused to defend the Kentucky marriage laws. R.34, VTC, PgID.749-750, 756. According to Atty. Gen. Conway in his tearful and prayer-induced proclamation at the time, "There are those who believe it's my mandatory duty, regardless of my personal opinion, to

**C.     Davis' Sincerely-Held Religious Beliefs About Marriage.**

Davis serves as the elected county clerk for Rowan County, Kentucky. R.26, Prelim. Inj. Hr'g (7/20/2015), Davis Testimony, PgID.240; R.34, VTC, PgID.746-747. Before taking office as the county clerk in January 2015, she worked at the Rowan County clerk's office as a deputy clerk for nearly thirty years. R.26, Prelim. Inj. Hr'g (7/20/2015), Davis Testimony, PgID.240; R.34, VTC, PgID.746-747. Davis is a professing Christian who attends church "[e]very time the doors are open," attends weekly Bible study and worship services, leads a weekly Bible study with women at a local jail, and is described by Rowan County's highest elected official as "very religious." R.26, Prelim. Inj. Hr'g (7/20/2015), Davis Testimony, PgID.245-246; *id.*, Blevins Testimony, PgID.236; R.34, VTC, PgID.751.

As a Christian, Davis possesses a sincerely-held religious belief that marriage is a union between one man and one woman, only. R.26, Prelim. Inj. Hr'g (7/20/2015), Davis Testimony, PgID.247-248; R.34, VTC, PgID.751. At the time she took office (not to mention during her multi-decade tenure as a deputy clerk) Kentucky's marriage definition perfectly aligned with her sincerely-held religious

---

continue to defend this case…**I can only say that I am doing what I think is right. In the final analysis, I had to make a decision that I could be proud of** – for me now, and my daughters' judgment in the future." *Id.* at PgID.749-750 (emphasis added). Gov. Beshear did not force Atty. Gen. Conway to abandon his "inescapable" conscience and instead hired outside counsel to represent Kentucky in defending its own Constitution and democratically-enacted laws—which cost Kentucky upwards of $200,000. *Id.* at PgID.749-750, 756-757.

beliefs about marriage. R.34, VTC, PgID.747-748, 752. As county clerk before the SSM Mandate, she authorized all of the "marriage" licenses issued from her office, and they bore her name in multiple locations. R.26, Prelim. Inj. Hr'g (7/20/2015), Davis Testimony, PgID.253-257, 266, 293-294; R.34, VTC, PgID.749, 751. But Davis cannot authorize the marriage of same-sex couples because it violates her core religious beliefs and she cannot be a party to the issuance of SSM licenses: in her sincere belief, the endorsement of her name and authorization equates to approval and agreement. R.26, Prelim. Inj. Hr'g (7/20/2015), Davis Testimony, PgID.254-258 ("**Because if I say that I authorize that, I'm saying I agree with it, and I can't**."), 277-278 ("**[M]y religious beliefs can't condone issuing and being a party to the issuance of same-sex marriage licenses**."), 283, 291, 296 (emphasis added); R.34, VTC, PgID.751.

On June 27, 2015, following the SSM Mandate, Davis obeyed her conscience and discontinued authorizing marriage licenses. R.26, Prelim. Inj. Hr'g (7/20/2015), Davis Testimony, PgID.249; R.34, VTC, PgID.755. Expressly to avoid disparate treatment of any couple and to ensure that all individuals and couples were treated the same, Davis withdrew her authorization to issue any marriage license in her name to any couple – same-sex or opposite sex. R.26, Prelim. Inj. Hr'g (7/20/2015), Davis Testimony, PgID.259, 278, 283, 286; R.34, VTC, PgID.755. This was not a "spur-of-the-moment decision" reached by Davis; instead, it was something that she "had

prayed and fasted over weekly" in the weeks and months leading up to the *Obergefell* decision. R.26, Prelim. Inj. Hr'g (7/20/2015), Davis Testimony, PgID.250; R.34, VTC, PgID.755.

Davis sent a letter appealing to Gov. Beshear to uphold her religious conscience rights, and to call a special session of the Kentucky General Assembly to legislatively address the conflict between her religious beliefs and the SSM Mandate. R.34, VTC, PgID.755; *see also* R.34-5, Ltr. to Gov. Beshear, PgID.788. To date, Davis has received no response to her letter. During Davis's entire tenure in the Rowan County clerk's office, spanning nearly thirty years, neither Davis, any deputy clerk, nor Davis's predecessor in office ever asserted a religious objection to performing any other function of the clerk's office. R.26, Prelim. Inj. Hr'g (7/20/2015), Davis Testimony, PgID.267-268, 279-280; R.34, VTC, PgID.755.

### D.   The Lawsuit Against Davis.

On July 2, 2015, less than one week after Gov. Beshear issued his SSM Mandate, Plaintiffs (four couples; two same-sex and two opposite sex) filed this lawsuit alleging only federal constitutional claims and demanding that a particular county clerk (Davis) in a particular county (Rowan) authorize and approve their Kentucky marriage licenses on the new state forms supplied by the KDLA. Plaintiffs filed the action on behalf of themselves and a putative class consisting of "all present and future individuals who, though legally eligible to marry in Kentucky, will be

13

denied a marriage license pursuant to the Defendants' policy," in Rowan County. R.1, Compl., PgID.9. "**Named Plaintiffs**" moved to preliminarily enjoin Davis "from enforcing the challenged policy of refusing to issue marriage licenses **against them**," R.2, Pls.' Mot. Prelim. Inj., PgID.34 (emphasis added), and sought to enjoin Davis in her official capacity "from enforcing the policy of refusing to issue marriage licenses to any future marriage license applications **submitted by the Named Plaintiffs**." R.2-2, Proposed Prelim. Inj. Order, PgID.48 (emphasis added).

As support for their claims and injunctive relief, Plaintiffs pointed to the SSM Mandate. R.1, Compl., PgID.7-8 (referring to the June 26, 2015 "directive from the Chief Executive [Gov. Beshear]" that was sent to "all of Kentucky's County Clerks"); R.2-1, Memo. Supp. Pls.' Mot. Prelim. Inj., PgID.42 (contending that Davis' refusal to act "is contrary to the direct admonition of the Governor"). Evidentiary hearings on Plaintiffs' motion for preliminary injunction were held in Ashland, Kentucky (located in Boyd County, 60 miles from the Rowan County clerk's office)[3], and in Covington, Kentucky (located in Kenton County, 100 miles away). Multiple Plaintiffs attended the hearings. Plaintiffs' evidence was limited

---

[3]    This particular hearing occurred before Davis was even served with Plaintiffs' Complaint. The district court designated this deficiency as "roadblocks to getting to the merits," R.21, Prelim. Inj. Hr'g (7/13/2015), PgID.117-119, but nonetheless took testimony from multiple Plaintiffs, and denied a motion to terminate the hearing until Davis could be properly joined as a party by service of process. R.10, Order (7/13/2015), PgID.77-78.

exclusively to the claims of the named Plaintiffs, all of whom allegedly reside in Rowan County.

Rowan County is bordered by 7 counties, and the clerks' offices in these counties are within 30-45 minutes from the Rowan County clerk's office. R.26, Prelim. Inj. Hr'g (7/20/2015), Davis Testimony, PgID.269. More than ten other clerks' offices are within a one-hour drive of the Rowan County clerk's office, and these counties are issuing marriage licenses, along with the two counties where preliminary injunction hearings were held in this matter. R.26, Prelim. Inj. Hr'g (7/20/2015), Davis Testimony, PgID.269-270. Plaintiffs admitted that they never even attempted to obtain a license in any county other than Rowan County, despite the widespread availability of such licenses and even though Plaintiffs have the economic means and no physical handicap preventing such travel. R.21, Prelim. Inj. Hr'g (7/13/2015), Plaintiffs' Testimony, PgID.123, 127-128, 130, 133, 136, 140, 146-147. In fact, Plaintiffs only attempted to obtain a marriage license from the Rowan County clerk's office after becoming aware of Davis' religious objections to SSM. *Id.* at PgID.124-127, 130, 134-135, 142, 146-147.

Davis filed a verified third-party complaint on August 4, 2015 against Gov. Beshear, the issuer of the SSM Mandate, and Commr. Onkst, who oversees the

KDLA. R.34, VTC, PgID.745-776.[4] Davis also filed a motion for preliminary injunction to enjoin enforcement of the SSM Mandate and obtain an exemption "from having to authorize the issuance of Kentucky marriage licenses." R.39-7, Proposed Prelim. Inj. Order, PgID.1129-1130. The grounds on which Davis sought injunctive relief against the State Defendants are necessarily intertwined with the grounds on which she opposed Plaintiffs' motion for preliminary injunction against her. R.29, Resp. Pls.' Mot. Prelim. Inj., PgID.318-366; R.39-1, Memo. Supp. Mot. Prelim. Inj., PgID.828-876. Notwithstanding, rather than considering Davis' and Plaintiffs' requests together and allowing Davis to develop a further evidentiary record on her own request for individual religious accommodation from the SSM Mandate, the district court granted Plaintiffs' request for injunctive relief against Davis on August 12, 2015. R.43, Inj., PgID.1146-1173.

## E.    The Injunction.

The Injunction enjoins Davis in her official capacity "from applying her 'no marriage licenses' policy to future marriage license requests submitted by Plaintiffs." R.43, Inj., PgID.1173. The district court recognized that "this civil action presents a conflict between two individual liberties held sacrosanct in American

---

[4]    On that same day, Davis filed a motion to dismiss Plaintiffs' Complaint because the official capacity claims against her are duplicative of the claims against Rowan County, Plaintiffs failed to state a viable federal constitutional claim, and Plaintiffs failed to join a necessary party. R.32, Mot. Dismiss, PgID.663-700.

jurisprudence," thereby conceding that Davis' individual religious rights are being "threaten[ed]" and "infringe[d]" by Plaintiffs' demands for her approval of their proposed unions, and by the SSM Mandate to provide exactly that or resign. *Id.* at PgID.1147. Notwithstanding, the district court granted Plaintiffs' motion for preliminary injunction without fully considering Davis' "further develop[ed]" request for injunctive relief against the State Defendants. *Id.* at PgID.1164.

According to the district court, even though Plaintiffs indisputably were able to obtain a Kentucky marriage license from more than 130 locations, including all nearby and surrounding counties, Plaintiffs were likely to succeed on the merits of their purported right to marry claims under the Fourteenth Amendment of the United States Constitution and were being irreparably harmed by the effective closure of the Rowan County clerk's office for the issuance of marriage licenses. *Id.* at PgID.1154-1161. The district court acknowledged that "Plaintiffs can obtain marriage licenses from one of the surrounding counties," that "Plaintiffs have the means to travel to any one of these counties," and that Plaintiffs "are not totally precluded from marrying in Kentucky." *Id.* at PgID.1148, 1156. The district court nonetheless concluded that Plaintiffs were substantially harmed by the "no marriage licenses" policy because Plaintiffs "strongly prefer to have their licenses issued in Rowan County because they have significant ties to that community." *Id.* at PgID.1149; *see also id.* at PgID.1157 (as Rowan County residents, "it is

understandable that Plaintiffs would prefer to obtain their marriage licenses in their home county").[5] The district court further concluded that Plaintiffs' right to marry was directly and substantially burdened because "[t]he state has long entrusted county clerks with the task of issuing marriage licenses," and "[i]t does not seem unreasonable for Plaintiffs, as Rowan County voters, to expect their elected official to perform her statutorily assigned duties." *Id.* at PgID.1159.

The district court rejected Davis' claims and defenses under the Kentucky Religious Freedom Restoration Act ("Kentucky RFRA"), KY. REV. STAT. § 446.350, and the First Amendment of the United States Constitution, and similar Kentucky Constitution provisions. *Id.* at PgID.1161-1173. In rejecting Davis' religious liberty claims, the district court incorrectly concluded that the Kentucky marriage license form "does not require the county clerk to condone or endorse same-sex marriage" and instead merely "asks the county clerk to certify that the information provided is accurate and that the couple is qualified to marry under Kentucky law." *Id.* at PgID.1167; *see also id.* at PgID.1170 ("[T]he act of issuing a marriage license to a same-sex couple merely signifies that the couple has met the *legal requirements* to marry. It is not a sign of moral or religious approval.") (emphasis in original); *id.* at

---

[5]    The district court speculated that for other individuals, "it may be more than a preference." R.43, Inj., PgID.1157. Without any evidentiary record, the district court found that the "no marriage licenses" policy "significantly discourages" "other Rowan County residents" not before the court from exercising their right to marry. *Id.* at PgID.1157, 1159.

PgID.1172 ("Davis is simply being asked to signify that couples meet the legal requirements to marry. The State is not asking her to condone same-sex unions on moral or religious grounds, nor is it restricting her from engaging in a variety of religious activities.").

Despite acknowledging that the sincerity of Davis' religious beliefs was not disputed, the district court found that the burden on Davis' religious freedom is "more slight," because she "remains free to practice her Apostolic Christian beliefs" since she "may continue to attend church twice a week, participate in Bible Study and minister to female inmates at the Rowan County Jail," and "believe that marriage is a union between one man and one woman." *Id.* at PgID.1172. According to the district court, "her religious convictions cannot excuse her" from authorizing SSM licenses. *Id.* at PgID.1172-1173. The district court also speculated about religious accommodation requests that might be made at unspecified times in the future by other county clerks not before the court, and pointed to these hypotheticals as grounds for denial of Davis' particular claims based upon her undisputed sincerely-held religious beliefs. *Id.* at PgID.1157. Davis immediately appealed the Injunction to this Court.

Davis also moved to stay the Injunction pending appeal. R.45, Mot. Stay Pending Appeal, PgID.1207-1233. In denying this stay request for the same reasons it granted the Injunction, the district court nonetheless recognized (again) that

19

"constitutional issues" are involved in this dispute and reiterated that a constitutional "debate" is present in this case and therefore granted a temporary stay instead. R.52, Order (8/17/2015), PgID.1264-1265. Requests to stay the Injunction were also denied by a motions panel of this Court and the U.S. Supreme Court. In denying a stay of the Injunction on August 26, 2015, the motions panel stated that "As the County Clerk for Rowan County, Kentucky, Davis' official duties include the issuance of marriage licenses," and further stated that "[t]he injunction operates not against Davis personally, but against the holder of her office of Rowan County Clerk," and that "[i]n light of the binding holding of *Obergefell*, it cannot be defensibly argued that the holder of the Rowan County Clerk's office, apart from who personally occupies that office, may decline to act in conformity with the United States Constitution as interpreted by a dispositive holding of the United States Supreme Court." Doc. 28-1 at 2. On August 31, 2015, the Supreme Court denied Davis' application for stay of the Injunction without explanation.

While Davis was pursuing a stay of the Injunction, the district court entered an order staying any consideration of Davis' motion to dismiss Plaintiffs' Complaint and motion for preliminary injunction against State Defendants "pending review" of the Injunction on the merits by this Court. R.58, Order (8/25/2015), PgID.1289. This order effectively denied Davis' request for injunctive relief against the State Defendants, and Davis appealed the order. Davis sought an injunction pending

20

appeal, which the district court and the same motions panel denied. In denying this injunctive relief, the panel again stated that "As the Rowan County Clerk, Davis' duties include the issuance of marriage licenses," but refused to address the merits of Davis' claims under state law. Case No. 15-5961, Doc. 37-1 at 2-3.

### F.    The Expanded Injunction.

Despite the unambiguous agreement between what Plaintiffs requested in their motion for preliminary injunction and what the district court granted in the Injunction, Plaintiffs filed a motion on September 1, 2015 (**three weeks after** entry of the Injunction) to "clarify" the Injunction to encompass a class of persons not covered by the Injunction. R.68, Pls.' Mot. "Clarify" Prelim. Inj., PgID.1488-1495. Specifically, Plaintiffs moved for an order holding that the Injunction "applies **not only to future marriage license requests submitted by the four named Plaintiff couples in this action, but also to requests submitted by other individuals who are legally eligible to marry in Kentucky**." *Id.* at PgID.1488 (emphasis added). Thus, rather than a motion to "clarify," Plaintiffs actually sought to convert the Injunction's relief, which was limited and personal to them by their own request, into a class-wide preliminary injunction, even though: (1) they had never previously requested a **class-wide** injunction (R.2-2, Proposed Prelim. Inj. Order, PgID.48); (2) they presented no actual evidence regarding the purported "other members of the putative class" (R.68, Pls.' Mot. "Clarify" Prelim. Inj., PgID.1489); and (3) their

21

actual motion for class certification filed on August 2, 2015 was stayed on August 25, 2015, after Davis filed a motion requesting such relief, which **Plaintiffs did not timely oppose** (R.57, Virtual Order (8/25/2015)).

On September 3, 2015, the district court commenced the hearing it had exclusively noticed for another motion, Plaintiffs' contempt motion. R.69, Order (9/1/2015), PgID.1496. Before taking up the contempt motion, however, and without any advance notice to Davis, the district court called up Plaintiffs' motion to "clarify" the Injunction. R.78, Contempt Hr'g (9/3/2015), PgID.1570-1573. Davis objected to proceeding on the motion to "clarify" due to lack of fair notice, and due to the district court's lack of jurisdiction to expand the Injunction because it was already on appeal to this Court. *Id.* at PgID.1573-1580.

The district court acknowledged that the motion to "clarify" was not noticed for hearing, and that that the so-called "clarification" sought by Plaintiffs was, in fact, to add relief to the Injunction which was not sought by Plaintiffs in their motion for preliminary injunction. *Id.* at PgID.1571, 1578 ("**I recognize they did not request it in the original motion**.") (emphasis added). Nonetheless, over Davis' objection, and without more than same-day notice and without taking any evidence to support class-wide relief, the district court granted the expansion of the Injunction. *Id.* at PgID.1580-1581; *see also* R.74, Exp. Inj., PgID.1557. Davis appealed the Expanded Injunction to this Court.

### G.     The Incarceration of Davis.

Plaintiffs moved to hold Davis in contempt for violating the Injunction by failing to authorize a marriage license to one Plaintiff couple, and requested the imposition of "financial penalties sufficiently serious and increasingly onerous" to compel compliance, but specifically said they did not seek compliance "through incarceration." R.67, Pls.' Contempt Mot., PgID.1477-1487. Within minutes of that filing, the district court scheduled a contempt hearing to occur two days later, ordered Davis and all of her deputy clerks to be present at the hearing, and limited Davis to a five-page opposition due by close of business the next day. R.69, Order (9/1/2015), PgID.1496-1497.

On September 3, 2015, the district court held a contempt proceeding in Ashland (which was again attended by multiple Plaintiffs) and took testimony from a single Plaintiff and Davis. R.76, Witness List, PgID.1560. After receiving testimony and argument, the court read from the bench a decision presumably written before the hearing had even begun, and committed Davis to federal custody after holding her in contempt for violating the Injunction. R.78, Contempt Hr'g (9/3/2015), PgID.1651-1662. The court ordered Davis to jail as a contempt sanction for Davis' refusal to issue a marriage license in violation of her conscience, to one Plaintiff couple. *Id.* at PgID.1659-1661. The condition for Davis' release would be

23

her compliance with the Expanded Injunction, not the original Injunction. *Id.* at PgID.1661-1662; *see also* R.75, Contempt Order, PgID.1559.[6]

The district court then appointed criminal defense counsel for each of Davis' deputy clerks—all of whom had voluntarily appeared at the hearing—and interrogated the deputy clerks as to whether each of them would issue marriage licenses without Davis' authorization. R.78, Contempt Hr'g (9/3/2015), PgID.1667-1736. The district court conducted this inquisition of the deputy clerks a mere 30 minutes after they saw Davis hauled off to custody. Facing obviously similar consequences without notice, the deputy clerks who testified under oath stated that they would issue the licenses rather than face jail time, notwithstanding the religious objections stated by some of the deputy clerks. **Despite incarcerating Davis**, the district court did not even determine whether the marriage licenses it was ordering to be issued by the deputy clerks over Davis' objection and without her authorization were even valid under Kentucky law. *Id.* at PgID.1724 (licenses "may not be valid under Kentucky law"), 1728 ("I'm not saying it is [lawful] or it isn't [lawful]. I haven't looked into the point. I'm trying to get compliance with my order."), 1731-32. Davis appealed the Contempt Order to this Court.

---

[6]     The district court memorialized this most severe of contempt sanctions against Davis by a mere "minutes" order; no formal written order has been entered, despite the district court's representations that it "probably will enter some sort of written order following up the Court's decision." R.78, Contempt Hr'g (9/3/2015), PgID.1651, 1686.

**H.    Davis' Release From Imprisonment And Post-Release Accommodation From The SSM Mandate.**

On September 8, 2015, **the sixth day of Davis' incarceration**, Plaintiffs filed a status report pursuant to a prior district court order, showing the court that Plaintiffs had received marriage licenses from the deputy clerks. R.84, Status Report, PgID.1798-1800.[7] With Davis in jail, not having given her authorization to issue licenses, **the deputy clerks altered the marriage licenses**. R.84-1, Plaintiffs' Marriage Licenses, PgID.1801-1804 (replacing "KIM DAVIS" with "ROWAN COUNTY").

Following the status report, the district court ordered Davis released, indicating that the court was "satisfied that the Rowan County Clerk's Office is fulfilling its obligation to issue marriage licenses" under the Injunction, **despite the "alterations" to the marriage licenses**. R.89, Release Order, PgID.1827-1828 (emphasis added). The Release Order further commanded that "Davis **shall not interfere** in any way, directly or indirectly, with the efforts of her deputy clerks to issue marriage licenses" to "all legally eligible couples" (*i.e.*, the Expanded Injunction), on pain of new sanctions. *Id.* at PgID.1828 (emphasis in original). The

---

[7]    The status report showed that three of the four Plaintiff couples had received marriage licenses. R.84, Status Report, PgID.1798. Plaintiffs had previously indicated that the fourth couple, Plaintiffs Burke and Napier, who had never testified in this case, were apparently no longer interested in obtaining a marriage license. R.46, Resp. Mot. Stay Prelim. Inj., PgID.1235.

order also required the deputy clerks to file status reports with the district court every fourteen days. *Id.* at PgID.1828; *see also* R.130, Order (10/6/2015), PgID.2446 (extending due dates for deputy clerk status reports to every thirty days).

On September 14, 2015, Davis returned to work at the Rowan County clerk's office. On that day, she provided a public statement regarding the issuance of marriage licenses in Rowan County. Davis explained that she would not interfere with her deputy clerks' issuance of marriage licenses, but the licenses would be further modified to accommodate her sincerely-held religious beliefs by clarifying the omission of her name, title, and authority. Immediately that same day, the Kentucky Governor and Kentucky Attorney General both inspected the new licenses and publicly stated that they were valid and will be recognized as valid by Kentucky. R.132, Resp. Pls.' Mot. Reopen Class Cert., PgID.2456, 2458-2465; R.133, Resp. Pls.' Mot. Enforce, PgID.2484, 2487-2495. Since her return to work, marriage licenses deemed valid by the highest elected officials in Kentucky continue to be issued in Rowan County by deputy clerks to lawfully eligible couples without any interference or interruption. R.114, 116-119, 122, 125-129, 131, Deputy Clerk Status Reports. The marriage licenses currently available and issued in Rowan County also accommodate Davis' sincerely-held religious beliefs. R.132, Resp. Pls.' Mot. Reopen Class Cert., PgID.2456, 2458, 2460, 2464-2465; R.133, Resp. Pls.' Mot. Enforce, PgID.2487, 2490, 2494-2495.

26

## SUMMARY OF ARGUMENT

I.    The district court erred in granting the Injunction against Davis enjoining her to cease the "no marriage licenses" policy then in effect in the Rowan County clerk's office. The district court wrongly held that the absence of marriage licenses in Rowan County was a direct and substantial burden on Plaintiffs' right to marry under the Fourteenth Amendment. At the time, marriage licenses were available in more than 130 locations across the state, and Plaintiffs were indisputably able to obtain marriage licenses in locations as close as one-half hour away. The district court also wrongly concluded that Davis will not suffer irreparable harm if she is forced to authorize and approve marriage licenses that substantially burden her undisputed sincerely-held religious beliefs about marriage, in large part because the district court adopted an erroneous substantial burden analysis. The district court also failed to subject the SSM Mandate compelling Davis to issue marriage licenses that violate her beliefs to strict scrutiny. Davis' religious freedom is protected by the Kentucky RFRA and the United States and Kentucky Constitutions, notwithstanding her status as a publicly elected official. Further, the public interest supports reversal of the injunction because the public has a significant interest in protecting and safeguarding religious rights, especially since there are multiple alternatives by which Davis' sincerely-held religious beliefs could be accommodated, while

simultaneously allowing individuals to obtain valid marriage licenses, even in Rowan County. Accordingly, the Injunction against Davis should be reversed.

II.    For essentially the same reasons, the district court similarly erred in practically denying Davis' own request for preliminary injunctive relief against the State Defendants. As recent events have confirmed, the Kentucky Governor, in fact, had the power to grant the religious accommodation from the SSM Mandate that Davis sought, because the Kentucky Governor became the controlling policymaker on Kentucky marriage law following the Supreme Court's decision in *Obergefell*. Presently, marriage licenses are being issued in Rowan County to lawfully eligible couples that both accommodate Davis' religious objections and are validated and authorized by the Kentucky Governor and Kentucky Attorney General. Thus, the accommodating solution that is in place is the kind of simple accommodation Davis has been requesting from the outset of this litigation, and demonstrates why a preliminary injunction against the State Defendants should have been entered.

III.    The district court erred in expanding the Injunction while it was on appeal to this Court. Once the Injunction was appealed by Davis, bringing it within this Court's jurisdiction, the district court was deprived of jurisdiction to alter or expand the Injunction's scope. But the district court did just that by entering a new injunction order that materially expanded the Injunction to include relief that Plaintiffs did not request in their original motion for preliminary injunctive relief.

28

The district court then compounded this error by entering this new Expanded Injunction without more than same-day notice, without taking any evidence on this new class-wide relief, and without allowing Davis the opportunity to submit a written opposition, in violation of Davis' due process rights. Not only that, the district court incarcerated Davis subject to further sanctions, unless she complied with the dictates of this new Expanded Injunction. The district court's Expanded Injunction lays waste to well-established principles of jurisdiction and due process. Thus, the Expanded Injunction order is null and void, and should be reversed.

IV.    The district court erred in finding Davis in contempt and ordering her to be incarcerated as a prisoner of her conscience. As an initial matter, the Contempt Order should be reversed because the underlying Injunction on which it was based should be reversed. Additionally, the overreaching Contempt Order incarcerating Davis like a criminal is reckless and oppressive and should be reversed because the district court eviscerated Davis' constitutional due process rights, violated her rights under the Federal Religious Freedom Restoration Act by needlessly forcing her to choose between her religion and her personal freedom, and disregarded fundamental principles of federalism and comity by commandeering through the most intrusive means a state office run by an elected official. Remarkably, the district court placed Davis in federal custody so that it could conduct an inquisition of her employees under threat of similar punishment, to force the issuance of marriage licenses that

the district court acknowledged may not even be valid without Davis' authorization.

Certainly, the contempt power is not a wand to be waved so hastily and carelessly.

There is too much at stake in imprisonment for the district court to be uncertain of

the lawfulness of the effects of its own order. Accordingly, the Contempt Order

should be reversed, for it never should have passed. The release of Davis from

incarceration did not moot the appeal of this order, because the multiple legal errors

committed by the district court require correction from this Court to avoid similar

errors in the future and remove the ongoing personal stain of this improvident

contempt finding.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy which should be granted

only if the movant carries his or her burden of proving that the circumstances clearly

demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573

(6th Cir. 2002). The four factors typically considered in evaluating requests for

preliminary injunctive relief are: "(1) whether the movant has a strong likelihood of

success on the merits; (2) whether the movant would suffer irreparable injury absent

the injunction; (3) whether the injunction would cause substantial harm to others;

and (4) whether the public interest would be served by the issuance of an injunction."

*Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012). While the ultimate

decision to grant or deny preliminary injunctive relief is generally reviewed for

abuse of discretion, cases with First Amendment implications, as involved here, are reviewed de novo. *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689-90 (6th Cir. 2014); *Bays*, 668 F.3d at 819.

Appeals of contempt orders are typically reviewed for an abuse of discretion, which is defined as a "'definite and firm conviction that the trial court committed a clear error of judgment.'" *Elec. Workers Pension Trust Fund of Local Union #58 v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 378 (6th Cir. 2003) (citation omitted). Under this standard, a district court's order will be set aside if it "'relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard.'" *Id.* (citation omitted). However, because the Contempt Order violated the Federal Religious Freedom Restoration Act and therefore is not lawful, the contempt citation should be reviewed de novo. *U.S. v. Ali*, 682 F.3d 705, 708-11 (8th Cir. 2012).

## ARGUMENT

### I. The District Court Erred In Granting The August 12, 2015 Injunction Against Davis.

#### A. The District Court Wrongly Held That Plaintiffs Demonstrated A Direct And Substantial Burden On Their Right To Marry Under The Fourteenth Amendment.

The district court incorrectly held that the absence of marriage licenses in Rowan County for all couples was a direct and substantial burden on Plaintiffs' right to marry under the Fourteenth Amendment of the United States Constitution, while

marriage licenses were readily available throughout Kentucky. In reaching this conclusion, the district court erred in divining a newfound federal constitutional right under the Fourteenth Amendment—*i.e.*, to have a marriage license issued on demand **in a particular county** and authorized **by a particular person**, irrespective of the burdens placed upon that individual's freedoms. But no precedent from this Court or the Supreme Court, including *Obergefell*, establishes a right to have a particular person affix their name and imprimatur to a permanent record, especially if that person holds deep religious convictions prohibiting her from participating in, and approving of, SSM. That is an unfounded extension of *Obergefell*'s scope, at the expense of a person's religious rights. Relying upon this newfound right, the district court also mistakenly found that individuals who were financially and physically able to travel approximately one-half hour to a neighboring county to obtain marriage licenses were substantially harmed by the unavailability of marriage licenses in Rowan County. These errors led the district court to wrongly conclude that Plaintiffs had demonstrated substantial harm and a strong likelihood of success on the merits of their Fourteenth Amendment claims.

The Supreme Court has firmly held that not every act, policy, rule, or regulation "which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny." *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978). Under this Court's precedent, "[m]erely placing a non-oppressive burden on

the decision to marry . . . is not sufficient to trigger heightened constitutional scrutiny." *Montgomery v. Carr*, 101 F.3d 1117, 1125 (6th Cir. 1996). Instead, heightened scrutiny only applies to restrictions on the right to marry that are direct **and** substantial. A "direct and substantial" burden requires an "absolute barrier" in which individuals are "absolutely or largely prevented from marrying" *who* they want to marry or "absolutely or largely prevented from marrying a large portion of the otherwise eligible population of spouses." *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2001). The lack of marriage licenses in Rowan County before the Injunction "does not change the essential fact" that Plaintiffs were not barred "from getting married" in Kentucky; "nor did it prevent them from marrying a large portion of population," including persons who reside in Rowan County. *Id.* at 712. Thus, as a federal constitutional matter, the merits of Plaintiffs' Fourteenth Amendment claims must be evaluated in terms of **Kentucky's** statewide marriage licensing scheme and whether that scheme, which provided more than 130 locations for individuals to obtain marriage licenses before the Injunction, directly and substantially burdened Plaintiffs' right to marry in Kentucky. The district court therefore erred by focusing exclusively on the availability of licenses in a single county rather than the state.[8]

---

[8]    This error is further demonstrated by the district court's conclusion that county clerks serve as state (not county) officials in the issuance of marriage licenses, which makes the appropriate perspective from which to view Kentucky

Contrary to the district court's conclusion, this case is neither the same case as *Obergefell* nor controlled by it. Critically, the *Obergefell* opinion did not address, let alone answer, the panoply of implications stemming from its decision upon states' marriage licensing schemes, which have "long been regarded as a virtually exclusive province of the States." *U.S. v. Windsor*, 133 S.Ct. 2675, 2689-91 (2013). Nor did the opinion squarely address marriage licensing schemes, like Kentucky's, that must also be interpreted in light of pre-existing religious freedom protection laws, such as the Kentucky RFRA. At bottom, the majority in *Obergefell* reached two conclusions about the right to marry under the Fourteenth Amendment: (1) States may not absolutely bar an individual from marrying a person of the same-sex, and (2) States that recognize marriage, or provide benefits related to marriage, must do so on the same terms and conditions for same-sex couples as opposite sex couples. *Obergefell*, 135 S.Ct. at 2604-05. Neither of these conclusions is directly implicated in the case at bar. Thus, although this case would not exist but for *Obergefell*, that opinion does not bind this Court to a foregone conclusion in this case.

On the first point, before *Obergefell*, Plaintiffs were "absolutely prevented" from obtaining a Kentucky marriage license if they wanted to marry a person of the same sex. No same-sex couple was able to obtain a Kentucky marriage license in

---

marriage licensing statewide, not county-by-county. R.43, Inj., PgID.1153-1154, 1168.

any one of Kentucky's 120 counties. And even if same-sex couples had gotten "married" in a different state, their "marriages" would not have been recognized in Kentucky. After *Obergefell*, **even with the "no marriage licenses" policy in place in Rowan County**, same-sex couples desiring marriage licenses could obtain them because Kentucky was issuing marriage licenses to same-sex couples in more than 130 locations throughout the state, and Kentucky was universally recognizing SSM. Thus, there is no absolute (or near absolute) statewide ban at issue or being challenged here, as was involved in *DeBoer v. Snyder*, 772 F.3d 388 (6th Cir. 2014).

The second point of *Obergefell* is also not at issue here because same-sex couples and opposite sex couples are (and were) indisputably being treated the same in Kentucky, and in Rowan County, obviating any equal protection issue. The undisputed record shows that Davis discontinued the issuance of all marriage licenses, regardless of whether the applicant couple was opposite sex or same-sex. This step conforms with legislation recently passed in North Carolina that protects government officials similarly situated to Davis. N.C. GEN. STAT. § 51-5.5.[9] Nevertheless, Plaintiffs claimed a violation of their right to marry because they were

---

[9]    Moreover, across Kentucky, couples have access to marriage licenses on the same terms and conditions. Nearly all county clerks (117 out of 120) are either authorizing marriage licenses to same-sex couples, or not refusing to issue them on conscience grounds. For those few county clerks not authorizing marriage licenses, there is no evidence in the record showing that opposite sex couples are receiving licenses in those counties while same-sex couples are not.

35

unable to obtain a marriage license in a particular location (Rowan County) approved by a particular individual (Davis). But this is not a federal constitutional right created by *Obergefell*, or mandated by any other Supreme Court right to marry case.

Critically, the cases of *Loving v. Virginia*, 388 U.S. 1 (1968), *Zablocki*, 434 U.S. 374, *Turner v. Safley*, 482 U.S. 78 (1987), and *Obergefell*, 135 S.Ct. 2584, all involve statewide absolute (or near absolute) bans affecting marriage. *See*, *e.g.*, *Loving*, 388 U.S. at 11-12 (striking down Virginia absolute ban on inter-racial marriages); *Zablocki*, 434 U.S. at 379, 390-91 (striking down Wisconsin law that required any resident with child support obligations to satisfy such obligations before marrying and to obtain a court order permitting the marriage); *Turner*, 482 U.S. at 81-82, 99 (striking down Missouri prison regulation that imposed an "almost complete ban" on inmate marriage); *Obergefell*, 135 S.Ct. at 2593, 2599-2605 (striking down Kentucky, Tennessee, Michigan and Ohio laws that absolutely prohibited any marriage between same-sex couples). Some of the restrictions also came with criminal penalties attached for violating the terms of the restrictions (*e.g.*, *Loving* and *Zablocki*). Yet all of the above-cited marriage cases except *Loving* (which received strict scrutiny as a race-based classification) were evaluated under rational basis review, and none of them also implicated the fundamental rights of other persons.

The district court's erroneous conclusions about Plaintiffs' right to marry effectively convert every marriage-related law in all fifty states into a federal constitutional matter subject to injunction practice in federal courts—before legislatures, including Kentucky's (which is not in session until January 2016), can even respond to the Supreme Court's decision in *Obergefell*. Prior to *Obergefell*, most of the States' democratically-enacted marriage laws and domestic relations legislation, including Kentucky's, rested upon a definition of marriage as between a man and a woman, and state legislatures are only just beginning to respond to the comprehensive changes resulting from *Obergefell*. The Injunction short-circuited this legislative process in Kentucky, even though laws regarding "the definition and regulation of marriage" have "long been regarded as a virtually exclusive province of the States," *Windsor*, 133 S.Ct. at 2689-91, and leading Kentucky legislators agree that Kentucky's marriage statutes need to be re-evaluated in light of *Obergefell*, *see*, *e.g.*, R.73, Stivers Amicus, PgID.1548.

State marriage laws differ across the country, and Kentucky marriage law is far less restrictive (and thus far more permissive) than other states. For instance, some states require prospective couples to obtain a license only in the county where the ceremony will occur, *see*, *e.g.*, MD. CODE ANN., FAM. LAW § 2-401, whereas others (like Kentucky) permit residents to obtain their license in one county and hold their ceremony elsewhere, *see*, *e.g.*, KY. REV. STAT. §§ 402.050, 402.080, 402.100,

402.230; MINN. STAT. § 517.07. Some states require prospective couples to obtain their license only in their county of residence, *see*, *e.g.*, MICH. COMP. LAWS § 551.101; OHIO REV. CODE ANN. § 3101.05, whereas others (like Kentucky) allow residents to obtain a license in any county, *see*, *e.g.*, KY. REV. STAT. § 402.080; TENN. CODE ANN. § 36-3-103. Some states require prospective couples to wait to receive their license upon application, *see*, *e.g.*, MICH. COMP. LAWS § 551.103a (3 days); MINN. STAT. § 517.08 (5 days), whereas others (*e.g.*, Kentucky, Ohio, Tennessee) have no waiting period.

The district court's Fourteenth Amendment holding—that individuals purportedly have an "on demand" right to a marriage license in a particular county and authorized by a particular person—challenges States' long-standing regulation over marriage licensing, and also challenges laws exempting persons from participating in SSM, as currently exist in states such as North Carolina and Utah. For example, under the district court's faulty logic, Maryland, Michigan, and Ohio marriage laws are unconstitutional, because, as discussed above, they restrict marriage applicants from obtaining marriage licenses in the county of their own choosing, requiring instead that licenses be obtained only in counties specified by the state (*e.g.*, county of residence or county where ceremony is to be held). Such cannot be the case, and such cannot be the law, even after *Obergefell*.

38

Here, Plaintiffs claimed that they very much wanted to wed in Rowan County because of family or other ties, R.21, Prelim. Inj. Hr'g (7/13/2015), Plaintiffs' Testimony, PgID.128, 136, 146, and the district court elevated their "preference" to a newfound constitutional right. R.43, Inj., PgID.1157, 1159. Critically, however, there was nothing preventing Plaintiffs from having their wedding ceremonies with family and friends in Rowan County, because Kentucky, unlike Maryland, allows marriages to be officiated in any county, regardless of where the license was obtained. KY. REV. STAT. §§ 402.050, 402.080, 402.230.

Importantly, Plaintiffs presented no proof of any absolute or near absolute barrier preventing any Plaintiff from marrying whom they want to marry in Kentucky. Davis' inability to issue marriage licenses to Plaintiffs did not absolutely or largely prevent them from marrying whom they want to marry under Kentucky law. Instead, before entry of the Injunction, **Kentucky** was, indisputably, recognizing marriages, including marriages between same-sex couples. Also, at the time, marriage licenses were indisputably available to Plaintiffs in more than 130 locations throughout the state, including many locations within 30-45 minutes of where Plaintiffs allegedly reside.[10] Plaintiffs presented no evidence that anything or

---

[10]     Moreover, Plaintiffs drove approximately 60 miles to the Ashland courthouse and more than 100 miles to the Covington courthouse for hearings. More than fifteen county clerk's offices are within 60 miles of the Rowan County clerk's office, and more than sixty county clerk's offices are within 100 miles. R.39-1, Memo. Supp. Mot. Prelim. Inj., PgID.874.

anyone was physically or financially preventing them from obtaining a marriage license from these locations. Thus, Plaintiffs' "right to marry" claims based upon the Fourteenth Amendment against Davis should be evaluated under rational basis review, rather than heightened scrutiny.

Applying rational basis review requires reversal of the Injunction because Davis' actions advanced a legitimate governmental interest. *Curto v. City of Harper Woods*, 954 F.2d 1237, 1243 (6th Cir. 1992). By stopping the issuance of marriage licenses until appropriate (and very simple) accommodations were made, Davis ensured that other individuals' fundamental rights to religious accommodation secured by the First Amendment and the Kentucky RFRA (including her own) were also protected. In fact, protecting these natural and inalienable "religious liberties" is not merely a legitimate government interest, it is a compelling interest of the highest degree and foundational to the very establishment of the Commonwealth of Kentucky. *See*, *e.g.*, KY. CONST., Preamble (referring to Kentuckians' "religious liberties"); KY. CONST. § 5 ("No human authority shall, in any case whatever, control or interfere with the rights of conscience.").

No marriage right announced in *Obergefell* or any decision from this Court or the Supreme Court is violated by a statewide Kentucky marriage policy that (i) treats all couples the same, and (ii) rightfully accommodates religious conscience under the Kentucky RFRA and the United States and Kentucky Constitutions, while (iii)

leaving marriage licenses readily available to every couple throughout every region of the state and not preventing any Plaintiff from marrying whom they want to marry. Nothing in *Obergefell* requires a state, or a subdivision of a state, to even license marriage. Thus, any Injunction entered by the district court enjoining Davis to issue marriage licenses is effectively dependent upon a state law claim based upon a state law statute regarding a public official's alleged "long entrusted" and "statutorily-assigned" duties to authorize and issue marriage licenses. R.43, Inj., PgID.1149-1150, 1159, 1172-1173. But Plaintiffs did not assert any state law claim in their Complaint against Davis, which may itself be subject to dismissal on sovereign immunity grounds under the Eleventh Amendment if raised.

As a federal constitutional matter, any alleged harm caused to these particular Plaintiffs' right to marry in Kentucky (by not being able to obtain a marriage license in Rowan County) is not a direct *and* substantial burden on the right to marry protected by the Fourteenth Amendment. The district court erroneously found that the mere act of traveling approximately 30-45 minutes to obtain a marriage license equates to a federal constitutional violation of the right to marry under the Fourteenth Amendment, because Plaintiffs have a "preference" for obtaining a marriage license in their county of residence. But this alleged burden is no more constitutionally suspect than having to drive 30-45 minutes to a government office (for any reason, including the issuance of a marriage license) in the first place. Indeed, in some

41

counties, many individuals are certainly either physically farther away from their county clerk than 30-45 minutes or physically closer to another county clerk than their own, and certainly in some cases, both are true. Moreover, one could imagine situations where a particular license-issuing government office is closed for business (perhaps temporarily, perhaps indefinitely due to natural disaster), but this isolated unavailability of marriage licenses would not then constitute a federal constitutional violation under the Fourteenth Amendment because individuals have to drive to a different location. Plaintiffs have therefore failed to demonstrate, as they must, a direct *and* substantial burden on their right to marry in Kentucky that justifies the Injunction.[11] Without a direct and substantial burden on Plaintiffs' right to marry, the district court incorrectly held that Plaintiffs were substantially harmed and likely to succeed on the merits of their Fourteenth Amendment claims.

---

[11]    Subsequent to the Injunction, Plaintiffs disclosed that one plaintiff couple was no longer interested in a marriage license because they were "making new wedding arrangements." R.46, Pls.' Resp. Mot. Stay Prelim. Inj., PgID.1235. More recently, another plaintiff couple who received a marriage license now claims they are not going to be married until some unidentified date in 2016, despite asking for an immediate Injunction against Davis and to have her held in contempt on the basis of supposed irreparable and ongoing harm befalling them each day they were denied a license in Rowan County. R.138, Pls.' Reply Supp. Mot. to Reopen Class Cert., PgID.2526-2527.

**B.     The District Court Wrongly Held That Davis Will Not Suffer Irreparable Harm To Her Religious Freedom.**

The district court incorrectly found that Davis will not suffer substantial and irreversible harm if she is forced to authorize marriage licenses that violate her undisputed sincerely-held religious beliefs protected by the Kentucky RFRA and United States and Kentucky Constitutions. "[I]t is well-settled that 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). If religious rights "'are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.'" *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) (citation omitted).

**1.     The First Amendment And Kentucky RFRA Apply To Davis As A Person.**

The Kentucky RFRA was enacted in 2013 by an overwhelming and bipartisan majority in the Kentucky Legislature, over Gov. Beshear's veto, to protect Kentuckians' religious liberties. The Kentucky RFRA is similar to the federal Religious Freedom Restoration Act ("Federal RFRA"), 42 U.S.C. § 2000bb-1(a) & (b), which was enacted in 1993 in response to a Supreme Court decision to "provide very broad protection for religious liberty," *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751, 2760 (2014), and imposes "the most demanding test known to

constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Specifically, the Kentucky RFRA provides that:

> Government shall not substantially burden a person's freedom of religion. The right to act or refuse to act in a manner motivated by a sincerely held religious belief may not be substantially burdened unless the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest.

KY. REV. STAT. § 446.350. Thus, the Kentucky RFRA protects a "**person's**" "right to act **or refuse to act** in a manner motivated by a sincerely held religious belief," mandating that such person's right "may not be substantially burdened." *Id.* (emphasis added); *see also Prater v. City of Burnside, Ky.*, 289 F.3d 417, 427 (6th Cir. 2002) (Free Exercise Clause "protects not only the right to hold a particular religious belief, but also the right to engage in conduct motivated by that belief").

As such, the Kentucky RFRA protects not only a person's beliefs but also a person's actions (or non-actions) based thereon, and subjugates to the strictest scrutiny any governmental action (be it legislative or regulatory scheme, or executive action) substantially burdening religiously-motivated actions (or non-actions).[12]

---

[12]    Because Davis' free exercise claim is combined with a free speech claim, her free exercise claim is also subject to strict scrutiny. *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 881 (1990).

Davis possesses rights under the Kentucky RFRA because the statute protects the religious freedoms of all "persons" in Kentucky from being substantially burdened by government. KY. REV. STAT. § 446.350. While "person" is not defined in the Kentucky RFRA, it is defined in Kentucky's general definitions statute to include "individuals," and publicly elected officials are not excluded. KY. REV. STAT. § 446.010(33). The Kentucky Constitution likewise provides religious freedom and conscience protections for all persons. KY. CONST. §§ 1, 5. The district court thus rightly concluded that the Kentucky Constitution and Kentucky RFRA apply to Davis, the elected Rowan County clerk.

Moreover, persons may seek religious liberty protection from Kentucky's marriage licensing scheme under the Kentucky RFRA. The district court erred in ignoring this analysis. The Kentucky RFRA is housed under Chapter 446 of Kentucky's statutes, which is entitled "Construction of Statutes," and includes such other generally applicable provisions as "Definitions for Statutes Generally," "Computation of Time," "Severability," and "Titles, Headings, and Notes." KY. REV. STAT. §§ 446.010, 446.030, 446.090, 446.140. Even more specifically, the Kentucky RFRA is included under a section of Chapter 446 reserved for "Rules of Codification." As such, Kentucky's marriage statutes—much like any other body of Kentucky law—cannot be interpreted without also considering and applying the Kentucky RFRA. To date, no reported case has tested the applicability of Kentucky

RFRA in the context of Kentucky's marriage licensing scheme. But that is not cause for denying its inapplicability. Instead, the lack of reported cases simply evidences the settled nature of marriage law, before the SSM Mandate. Other hypothetical religious objections that Plaintiffs and the district court trotted out to distract attention from the actual claim in this case (*e.g.*, so-called "religious objections" to inter-racial marriage or re-marriage) could have already been made under the Kentucky RFRA, which was enacted more than two years ago. The fact that they were not evidences the academic nature of such hypotheticals, in contrast with Davis' actual and present concern.

First Amendment precedent also overwhelmingly supports the conclusion that publicly-elected officials possess individual religious rights, notwithstanding their election to public office. "Almost fifty years ago, this Court declared that citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 134 S.Ct. 2369, 2374 (2014). Indeed, the Supreme Court has "made clear that public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Although a citizen entering government service must "by necessity" accept "certain limitations on his or her freedom," *id.* at 417, such person's constitutional rights are not circumscribed in their entirety. Instead, there are "some rights and freedoms so fundamental to liberty" that a citizen is "'not deprived of [these] fundamental rights

46

by virtue of working for the government.'" *Borough of Duryea, Pa. v. Guarnieri*, 131 S.Ct. 2488, 2493-94 (2011) (citation omitted). Thus, a person's constitutional and statutory rights and liberties are not immediately eviscerated the moment they take office. As such, the district court rightly concluded that the First Amendment applies to Davis.

The opinion of a motions panel of this Court denying a temporary stay of the Injunction suggests that Davis does not retain any individual rights as county clerk. In so doing, the panel seemingly adopted a religious freedom-limiting understanding of "person" that the Supreme Court rejected in an analogous situation in *Hobby Lobby*, wherein those seeking to limit religious freedom argued that companies (who are legal "persons") did not possess religious rights under the federal RFRA—only individuals had religious rights. Rejecting this notion, however, the Supreme Court held that a closely-held corporation did, in fact, have religious liberty protections as a "person" under the Federal RFRA, because the individuals taking actions on behalf of the company (which can only take actions with individuals acting on its behalf) had religious rights that must be protected. *Hobby Lobby*, 134 S.Ct. at 2759.

In a similar vein, a public official has religious liberty protections under the First Amendment and, in this case, the Kentucky RFRA, as a person. Like the corporate fiction, courts have developed the legal fictions of "official capacity" and "individual capacity" for purposes of addressing immunity doctrines and

determining liabilities and potential remedies against persons who work for government. But these jurisprudential capacity distinctions do not prohibit a person who is a public official from exercising protected religious beliefs. The official capacity designation reflects the reality that an individual person occupies a public office, and the office cannot take action without the individual's taking action. But it is not as if Davis the individual person stops existing while Davis is in the Rowan County clerk's office performing her duties as Rowan County clerk.

Thus, the "official capacity" distinction is not helpful in answering the religious liberty question by feigning to determine whether a person's action (or non-action) is taken (or not taken) in an official capacity or an individual capacity. Not all actions can be so cleanly severed, and the very nature of religious accommodation is an accommodation for the individual from a job function or duty. Importantly for Davis, it was not her "office" but herself, individually, that was jailed for six days as a result of her individual conscience. Officials who are found guilty of committing crimes face criminal punishment themselves, not their offices. Moreover, Plaintiffs **sued Davis in her individual capacity** seeking punitive damages from her personally. By suing her individually, Plaintiffs concede the relevancy of Davis in her individual capacity as the person occupying the office of Rowan County clerk. Furthermore, the Injunction against Davis in her official capacity (the issuance of marriage licenses) necessarily implicates Davis in her individual capacity because

48

of her personal involvement in the act of issuing, approving, endorsing, and participating in a marriage license that bears her name, other personal identifiers, and authorization. Lastly, Davis in her official capacity has an obligation to comply with all constitutional norms, protections, and obligations that affect other persons— including her own individual capacity and the rights of her employees. It is therefore an untenable judicial construct and fiction to claim that Davis' individual rights are of no consequence to her actions as Rowan County clerk.

To contend otherwise is similar to arguing that actions taken by a company (such as providing insurance coverage), do not implicate the individual religious rights of the persons who take actions on behalf of the company. According to this logic (which the Supreme Court rejected), the actions taken by a public official do not implicate the individual religious rights of the person who takes those actions as the public official. This approach would lead to the conclusion that public officials are not afforded religious liberty protections or, for that matter, any Constitutional or statutory civil rights. As demonstrated above, that is not the law.

### 2.    The SSM Mandate Constitutes Government Action.

The district court correctly found that the Gov. Beshear's June 26, 2015 letter and subsequent directives that compose the SSM Mandate constitute state action. R.43, Inj., PgID.1151, 1163-1167, 1172 (referring to the "Beshear directive"). Although not a formal executive order issued under Chapter 12 of Kentucky's

revised statutes, the Beshear Letter effectively operates as one, directing county clerks to take certain actions and providing instructions on the issuance of marriage licenses and recognition of SSM. *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922, 937 (1982) (holding that state action occurs when the conduct allegedly depriving the claimant of constitutional rights is fairly attributable to the state, which arises when the deprivation is caused by "a rule of conduct imposed by the state or by a person for whom the State is responsible"). This directive—issued before the ink was even dry from the Supreme Court's decision in *Obergefell*—installs Gov. Beshear as the controlling policymaker of Kentucky marriage law post-*Obergefell*, at least until the General Assembly has an opportunity to meet.

The entire Kentucky marriage licensing scheme turns on the definition of "marriage," which is defined at the very beginning of Chapter 402 of Kentucky's revised statutes. KY. REV. STAT. § 402.005. The *Obergefell* majority opined that this current definition is unconstitutional. But the majority opinion in *Obergefell* did not legislatively replace, nor could it, the definition for "marriage" in Kentucky. Nor did *Obergefell* consider the implications of its ruling on legislative marriage schemes. Every provision that follows § 402.005 in Chapter 402, including the penalty

50

provisions, depends upon the prior definition of marriage, which has been found

unconstitutional **but not yet replaced**.[13]

Until the General Assembly has an opportunity to reconvene (which Gov.

Beshear refuses to do through a special session pursuant to KY. CONST. § 80, despite

bipartisan requests) and address Kentucky's marriage law, there is no absolutely

clear or necessarily operative legislative duties on marriage. In an amicus filing,

Kentucky's Senate President agreed that "the concept of marriage as between a man

and a woman is so interwoven into KRS Chapter 402 that the defendant County

Clerk cannot reasonably determine her duties until such time as the General

Assembly has clarified the impact of *Obergefell* by revising KRS Chapter 402

through legislation," or "[a]lternatively the clerk's duties could be clarified by

---

[13]    *See*, *e.g.*, KY. REV. STAT. § 402.020 ("**Marriage** is prohibited and void: . . .") (emphasis added); KY. REV. STAT. § 402.080 ("No **marriage** shall be solemnized without a license therefor.") (emphasis added); KY. REV. STAT. § 402.100 (referring to "**marriage**" or "married" **21 times**) (emphasis added); KY. REV. STAT. § 402.105 ("A **marriage** license shall be valid for thirty (30) days…") (emphasis added); KY. REV. STAT. § 402.110 ("The form of **marriage** license prescribed in KRS 402.100 shall be uniform throughout this state…") (emphasis added); KY. REV. STAT. § 402.230 (noting that "**marriage**" certificate must be "filed in the county clerk's office") (emphasis added); KY. REV. STAT. § 402.990(6) ("Any clerk who knowingly issues a **marriage** license to any persons prohibited by this chapter from marrying shall be guilty of a Class A misdemeanor and removed from office by the judgment of the court in which he is convicted.") (emphasis added); KY. REV. STAT. § 402.990(7) ("Any clerk who knowingly issues a **marriage** license in violation of his duty under this chapter shall be guilty of a Class A misdemeanor.") (emphasis added).

Executive Order of the Governor under KRS Chapter 12." R.73, Stivers Amicus, PgID.1548. **But there *is* Gov. Beshear's SSM Mandate**.

At the initiative of Gov. Beshear, the KDLA designed and approved a post-*Obergefell* marriage license form. Gov. Beshear certainly was under no obligation to issue the **modified** form that he ultimately did. He also could have stated that, in light of *Obergefell*, all marriage licenses will be issued on his authority (not the county clerks' authority) until the Kentucky Legislature has an opportunity to address the legislative scheme. Rather than wait even a single business day, he fired off the Beshear Letter and commandeered individual county clerks to join in, participate in, and approve of SSM regardless of their individual beliefs, and immediately without any consideration of religious accommodations. Yet it was his newly revised form that came with "**instructions**" for its use (R.34-4, Post-*Obergefell* Marriage License, PgID.784), and his SSM Mandate that county clerks "**must license**" (R.1-3, Beshear Letter, PgID.26; emphasis added), that triggered the underlying lawsuit **against Davis**. R.1, Compl., PgID.7-8; R.2-1, Memo. Supp. Pls.' Mot. Prelim. Inj., PgID.42. Indeed, without this new form available, there would have been no gender-neutral license for same-sex couples to even obtain in Rowan County. R.34-1, Pre-*Obergefell* Marriage License, PgID.778 (designating "bride" and "groom"). To obtain a license, they would have had to sue Gov. Beshear and

52

seek injunctive relief from him in the form of a modified license issued on his authority.

### 3. The District Court Adopted An Erroneous Substantial Burden Analysis.

Despite concluding that Davis' fundamental rights are implicated in this case and that she indisputably holds sincere religious beliefs about marriage, R.43, Inj., PgID.1146-1147, 1164, 1167, the district court nonetheless adopted an erroneous substantial burden analysis contrary to the Kentucky RFRA and precedent from the Supreme Court and Sixth Circuit. *Id.* at PgID.1172-1173.

It is not for the district court to question the reasonableness of Davis' beliefs about marriage – yet that is precisely what the court did. *Hobby Lobby*, 134 S.Ct. at 2778-79 (citing *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 716 (1981)). Judges "are not arbiters of scriptural interpretation," and they are not tasked with determining who "more correctly" perceives their faith's commands. *Id.* Similar to the Federal RFRA, the Kentucky RFRA asks whether a government mandate (such as the SSM Mandate) "imposes a substantial burden on the ability of the objecting parties" to act "in accordance with *their religious beliefs*," not whether Davis' religious beliefs about authorizing SSM licenses are reasonable. *Hobby Lobby*, 134 S.Ct. at 2778 (emphasis in original). Accordingly, it was wrong for the district court to determine that Davis' religious beliefs are "mistaken or *insubstantial*," because the "'narrow function' . . . in this context is to determine'

53

whether the line drawn reflects 'an honest conviction,' and there is no dispute that it does." *Id.* at 2779 (internal citation omitted and emphasis added).

As detailed above, Davis indisputably believes that issuing the license is tantamount to authorizing and approving SSM, which her religious beliefs and conscience prohibit. That is, Davis believes that providing the marriage authorization "demanded by" the SSM Mandate is "connected" with SSM "in a way that is sufficient to make it immoral" for her to authorize the proposed union and place her name on it. *Id*. at 2778-79. The prescribed marriage license form required under the SSM Mandate provides no opportunity for the religious objector (Davis) not to participate in endorsement and approval of SSM, according to her sincerely-held religious beliefs. The specific form uses the word "marriage" at six different places, twice designates Davis as the person authorizing the marriage license, requires the stamping of her name ("KIM DAVIS") and endorsement on any license issued in Rowan County, and also requires her to authorize the "join[ing] together in the state of matrimony" a proposed union that she cannot approve. Davis cannot authorize and call "marriage" a union of two persons which, in her sincerely-held belief, is not marriage. Unlike other governmental licensing or registration schemes that Kentucky provides (*e.g.*, driver's licenses, fishing and hunting licenses, motor vehicle registration, voter registration), the issuance of a marriage license requires an individual person (Davis) to authorize a particular relationship between persons

against her religious convictions. To authorize a SSM license bearing her name and imprimatur sears her conscience because she would be endorsing the proposed union and calling something "marriage" that is not marriage according to her beliefs. This is the line indisputably drawn by Davis' conscience, and it cannot be moved or re-drawn by a court. *See Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d 927 (8th Cir. 2015) (holding that if "one sincerely believes that completing" an opt-out form from the HHS contraceptive mandate "will result in conscience-violating consequences, what some might consider an otherwise neutral act is a burden too heavy to bear").[14]

Despite this undisputed testimony regarding the sincerity of her belief, the district court erroneously concluded that the burden on Davis is "more slight," R.43, Inj., PgID.1172—a conclusion that is out-of-step with Supreme Court precedent analyzing substantial burdens on religious freedom under the analogous Federal RFRA. When sincerity is undisputed, as involved here, a court must consider the religious belief or conduct at issue and determine whether the government has placed substantial pressure—*i.e.*, a substantial burden—on the religiously-motivated objector to act in a way that violates their religious belief or to refrain from acting in

---

[14]    Moreover, in this Court, Plaintiffs have already conceded that they "**do not dispute that Davis opposes same-sex marriage due to her personal religious beliefs, nor that those beliefs are sincerely held**." Doc. 25 at 14 (emphasis added); *see also* Case No. 15-5961, Doc. 28 at 18; R.36, Pls.' Reply Supp. Mot. Prelim. Inj., PgID.803; R.78, Contempt Hr'g (9/3/2015), PgID.1648-1649.

a way that their belief requires. *Hobby Lobby*, 134 S.Ct. at 2775-76 (holding that a substantial burden arises when the government "demands" a religiously-motivated objector to either "engage in conduct that seriously violates [her] religious beliefs" or suffer "substantial" "consequences"); *see also*, *e.g.*, *Sharpe Holdings*, 801 F.3d 927.

By holding that the burden on Davis is merely "slight," the district court emasculated the substantial burden analysis and conducted a thinly-veiled (and improper) critique on Davis' beliefs. In concluding that the act of issuing SSM licenses would not severely burden Davis' religious convictions because such act would not implicate moral or religious approval of SSM, the district court essentially told Davis what her religious convictions **should** be, instead of recognizing the undisputed fact of what her religious convictions actually are. The district court's conclusion also failed to acknowledge that Davis' indisputably sincere convictions bar her from approving SSM licenses bearing her name and authorization. In sum, that conclusion disregards key precedent analyzing substantial burdens on religious freedom, and represents judgmental steps that that the Supreme Court has "repeatedly refused to take," because it is just another way of deeming Davis' religious beliefs as flawed, mistaken, incorrect, unreasonable, or insubstantial. *Hobby Lobby*, 134 S.Ct. at 2778.

56

With Davis' sincerity and honest conviction unchallenged in the district court, the substantial burden imposed on Davis through the SSM Mandate could not be more clear. In Gov. Beshear's view, Davis must either comply with his SSM Mandate, or resign from office. R.34, VTC, PgID.754, 757. On Gov. Beshear's own initiative post-*Obergefell*, the KDLA prepared a revised marriage form in response to his SSM Mandate, which was then distributed to county clerks for them to begin using immediately, without exception, per Gov. Beshear's directive. The prescribed form under Gov. Beshear's SSM Mandate provided no opportunity for the religious objector Davis ***not*** to participate in endorsement and approval of SSM. Thus, Gov. Beshear is imposing a direct and severe pressure on Davis by the SSM Mandate, forcing Davis "to choose between following the precepts of her religion and forfeiting benefits [her job], on the one hand, and abandoning one of the precepts of her religion in order to accept work [keep her job], on the other hand." *Sherbert v. Verner*, 374 U.S. 398, 404 (1963); *see also Holt v. Hobbs*, 135 S.Ct. 853, 862 (2015) (government places a "substantial burden" on religious exercise if policy requires person "to 'engage in conduct that seriously violates [her] religious beliefs'" or "contravene that policy and . . . face serious disciplinary action") (citing *Hobby Lobby*, 134 S.Ct. at 2775); *Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014) (government places a "substantial burden" on religious belief when it "'place[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs,'

57

or 'effectively bar[s]' his sincere faith-based conduct") (internal citations omitted). This Hobson's choice places undue pressure on Davis to choose between her job and her religion. The SSM Mandate demands that she either fall in line (her conscience be damned) or leave office (her livelihood and job for three-decades in the clerk's office be damned).

In addition to his unmitigated "approve or resign" rule, Gov. Beshear ominously declared that "the courts" will deal with county clerks who do not comply with his SSM Mandate. R.34, VTC, PgID.756-757. Also, immediately after issuance of the SSM Mandate, Atty. Gen. Conway even threatened possible legal action against county clerks who did not comply with the SSM Mandate, even seemingly inviting this very lawsuit against Davis: "Any clerk that refuses to issue marriage licenses is opening himself or herself to potential legal liability and sanctions. Any couple or person denied a license may seek remedy in federal court, but should consult with a private attorney about their particular situation." R.39-1, Memo. Supp. Prelim. Inj. Mot., PgID.851 (citing sources).

Thus, the consequences of, and threats associated with, not performing this task are grave, and beyond job loss—including, civil liability; sanctions; private lawsuits in federal court; contempt motions; imprisonment; criminal charges. Davis was threatened with, suffered, and/or is experiencing all of the above simply by choosing to adhere to her sincere religious beliefs. If this is not an obvious substantial

burden on undisputed sincere beliefs, it is difficult to imagine what burden could ever be substantial enough to merit relief. Certainly, religious liberty protections, including the Kentucky RFRA and First Amendment, are designed to protect a person from such substantial burdens upon their religious freedom.[15]

Importantly, Davis is not claiming a substantial burden on her religious freedom if *someone else* authorizes and approves a SSM license *devoid of her name and similar personal identifiers (e.g., title)*.[16] For example, Davis is not claiming that her religious freedom is substantially burdened if she must complete an opt-out form to be exempted from issuing SSM licenses, as Kentucky law already permits for other licensing schemes. Davis is also not claiming that a SSM license authorized by someone else in Rowan County, and scrubbed of her name and authority, substantially burdens her religious freedom. Davis is also not claiming that the mere administrative act of recording a marriage license substantially burdens her religious

---

[15]    To that end, a pre-filed bill for the upcoming session of the Kentucky Legislature (introduced after *Obergefell* and the commencement of this lawsuit) would expressly protect clerks like Davis from having to issue SSM licenses, amending the Kentucky RFRA to state expressly that "[i]ssuing or recording" a SSM license can be considered a "substantial burden for which there is no compelling government interest." R.39-6, An Act Relating to Marriage, Ky. House Bill 101 (2016 Reg. Sess.), PgID.1125-1128.

[16]    It is no "accommodation" at all for deputy clerks in Rowan County to issue marriage licenses bearing Davis' name and/or title *if* such licenses appear to be, or can be deemed to be, issued on Davis' authority. To accommodate her religious beliefs, Davis' name must be removed from any such licenses, and the authorization and approval must come from another person.

freedom. But she is substantially burdened if she must authorize and approve a SSM license bearing her name and imprimatur as the authorizing agent because she can neither call a proposed union "marriage" which is not marriage in her sincerely-held religious beliefs, nor authorize that union.

Ordering Davis to authorize and approve a SSM license is ordering *the act* that violates her conscience and substantially burdens her religious freedom. It is comparable to forcing the religious objecting nurse to perform an abortion, the religious objecting company to pay for abortions or abortion-related insurance coverage, the religious objecting non-combatant to fire on an enemy soldier, or the religious objecting state official to participate in or attend the execution of a convicted prisoner. Because there is no dispute that Davis possesses the requisite "honest conviction" regarding her beliefs about marriage, and she faced (and is facing) severe consequences of adhering to that conviction, her religious freedom is undeniably substantially burdened by the SSM Mandate.

### 4.    The SSM Mandate Cannot Survive Strict Scrutiny.

To overcome this substantial burden on Davis' religious freedom, the SSM Mandate must embody (1) a compelling governmental interest in infringing Davis' individual religious conscience and (2) be the least restrictive means to accomplish that interest. Under this strict scrutiny analysis, to be a compelling governmental interest, the SSM Mandate must further an interest "of the highest order," *Church of*

*Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993), and, "if a less restrictive means is available for the Government to achieve its goals, the Government **must** use it." *U.S. v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 815 (2000) (emphasis added). The Kentucky RFRA requires clear and convincing proof of **both** a particularized compelling governmental interest in infringing Davis' religious freedom *and* the least restrictive means for achieving that interest. Thus, the SSM Mandate—the state action here, R.43, Inj., PgID.1151, 1163-1167, 1172—must survive strict scrutiny. The district court failed to conduct this analysis.

> **a.    Application Of The SSM Mandate Without Religious Accommodation For Davis Does Not Serve A Compelling Governmental Interest.**

Under the required strict scrutiny analysis, only a compelling governmental interest in infringing upon the specific act or refusal to act at issue (*i.e.*, Davis' inability to authorize and approve SSM licenses) will suffice. This inquiry "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law '**to the person**'—the particular claimant whose sincere exercise of religions is being substantially burdened," *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006) (emphasis added) (quoting 42 U.S.C. § 2000bb-1(b)), and further requires courts "to 'loo[k] beyond broadly formulated interests' and to 'scrutiniz[e] the asserted harm of **granting specific exemptions to particular religious claimants**'—in other words,

61

to look to the marginal interest in enforcing" the SSM Mandate in this case. *Hobby Lobby*, 134 S.Ct. at 2779 (emphasis added) (quoting *O Centro*, 546 U.S. at 431). There is no compelling governmental interest in forcing Davis to violate her religious beliefs and conscience—in infringing upon her conscientious inability to authorize SSM licenses—and no one has shown why granting a "specific exemption" to this "particular religious claimant" will threaten Kentucky, or its marriage licensing scheme.

The SSM Mandate decreed by Gov. Beshear was neither expressly nor impliedly compelled by *Obergefell*, and leaves no room for individual county clerk's religious freedoms under the Kentucky RFRA and First Amendment. Immediately following *Obergefell*, Gov. Beshear, on his own initiative, implemented his SSM Mandate based upon a misreading of what the *Obergefell* decision "makes plain." R.1-3, Beshear Letter, PgID.26. **In *Obergefell*, the Supreme Court unanimously agreed that First Amendment protections remain despite same-sex "marriage."** Specifically, dissenting justices in *Obergefell* recognized that "[m]any good and decent people oppose same-sex marriage as a tenet of faith, and their freedom to exercise religion" is specifically "spelled out" in the First Amendment of the Constitution. *Obergefell*, 135 S.Ct. at 2625 (Roberts, C.J., dissenting). Continuing, these Justices noted that "[r]espect for sincere religious conviction has led voters and legislators in every State that has adopted same-sex marriage democratically to

62

include accommodations for religious practice." *Id*.; *see also id.* at 2638 (explaining the historical significance of "religious liberty") (Thomas, J., dissenting). **The majority also recognized that religious freedoms continue unabated even as they redefined marriage**. *Id.* at 2607 ("**persons**" continue to have First Amendment protections) (Kennedy, J.) (emphasis added). Gov. Beshear was thus under no compulsion to order each and every individual Kentucky County Clerk to authorize and approve SSM marriage. The "rule of law" conclusions reached by Gov. Beshear in his SSM Mandate and the district court in its Injunction, R.43, Inj., PgID.1160, 1166, are narrow-minded and outright ignore other laws requiring religious accommodation, namely the Kentucky RFRA and First Amendment.

Additionally, the district court's proverbial "slippery slope" suggestion that "like minded" exemptions require denial of Davis' exemption, *id.* at PgID.1157, does not withstand scrutiny under precedent from the Supreme Court and Sixth Circuit. *Haight*, 763 F.3d at 562 (rejecting prison warden's "like-minded" contention that if he grants one prisoner an accommodation he will then "have to grant others, having set a precedent with the 'first' accommodation"); *see also O Centro*, 546 U.S. at 436 (finding under Federal RFRA that this kind of argument represents "the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions"). Rather, the Kentucky RFRA, like its federal counterpart, "operates by mandating consideration, under the

63

compelling interest test, of exceptions to 'rule[s] of general applicability,'" and provides "'a workable test for striking sensible balances between religious liberty and competing prior governmental interests.'" *O Centro*, 546 U.S. at 436 (citing 42 U.S.C. §§ 2000bb–1(a), 2000bb(a)(5)).

Of course, religious accommodations are not provided for each and every whim or scruple raised by a person, and merely stating a religious objection does not mean that any county clerk can deny a marriage license at any time for any reason. As noted above, Davis has served in the Rowan County clerk's office for thirty years, and, during this entire time period, this is the first instance in which she (or even anyone else) has raised a religious objection to performing a function in the county clerk's office. R.34, VTC, PgID.755; R.26, Prelim. Inj. Hr'g (7/20/2015), Davis Testimony, PgID.267-268. Plainly, an accommodation of Davis' religious objections would not swallow marriage law in Kentucky, because marriage licenses were (and are) readily available in more than 130 locations throughout Kentucky. R.34, VTC, PgID.748, 754. Speculating about other individuals' possible requests for religious accommodation improperly subjects Davis' specific request to denial based upon others not before the Court and who have not demonstrated the requisite sincerity of belief and substantial burden as Davis undeniably has.

Furthermore, providing accommodation for religious conviction is not antithetical for public employees or inconsistent with generally applicable

governmental mandates, especially where, as here, the accommodation is not just possible, but easy, to provide. This Court has found that "[o]ur Nation's history is replete with . . . accommodation of religion." *ACLU v. Mercer Cnty., Ky.*, 432 F.3d 624, 639 (6th Cir. 2005). Nor is accommodation inconsistent with the Establishment Clause, as the district court erroneously implies. R.43, Inj., PgID.1160. The Supreme Court has concluded that "government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987); *see also Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 338 (1987) (there is "ample room for accommodation of religion under the Establishment Clause"). Indeed, in certain matters, the law already accounts for religious-based objections to generally applicable legal duties or mandates. For example, there are well-established historical roots for accommodating religious objections to abortion, capital punishment, and wartime combat, to name a few.

For marriage, the nature of the objection is even more firmly established in history because the "meaning of marriage" as a union between one man and one woman "has persisted in every culture," "has formed the basis of human society for millennia," and has singularly "prevailed in the United States throughout our history." *Obergefell*, 135 S.Ct. at 2611-13 (Roberts, C.J., dissenting). In fact, the

majority in *Obergefell* conceded that the institution of marriage as exclusively a union between a man and a woman "has existed for millennia and across civilizations" and this view "long has been held—**and continues to be held—in good faith by reasonable and sincere people here and throughout the world**." *Id.* at 2594 (Kennedy, J.) (emphasis added). Thus, although the traditional view of marriage was discarded in *Obergefell*, that long-held view of marriage provides the historical underpinnings for a religious exemption and accommodation from the redefinition of marriage. Accommodating a person's sincere religious beliefs and practices about marriage and ensuring that individual religious freedom is not substantially burdened promotes the religious pluralism and tolerance that have made this country distinctive—and specifically implements the religious accommodation envisioned by the Kentucky RFRA.

Finally, any purported government interest in enforcing the SSM Mandate without exemption is undermined by Gov. Beshear's treatment of Atty. Gen. Conway when he was unwilling to defend Kentucky's democratically-enacted marriage law pursuant to his own conscience about "doing what I think is right" and "mak[ing] a decision that I could be proud of." R.34, VTC, PgID.749-750, 756. Gov. Beshear is picking and choosing the conscience-based exemptions to marriage that he deems acceptable—which is constitutionally unacceptable. For instance, when Atty. Gen. Conway refused to defend the Kentucky Constitution on marriage, Gov.

Beshear did not direct him that "Neither your oath nor the Supreme Court dictates what you must believe. But as elected officials, they do prescribe how we must act," but he did so direct Davis. R.1-3, Beshear Letter, PgID.26. Gov. Beshear did not command Atty. Gen. Conway that "when you accepted this job and took that oath, it puts you on a different level," and "[y]ou have official duties now that the state law puts on you," but he did deliver this command to Davis. R.34, VTC, PgID.754, 756-757. Gov. Beshear did not publicly proclaim that Atty. Gen. Conway was "refusing to perform [his] duties" and failing to "follow[] the law and carry[] out [his] duty," and should instead "comply with the law regardless of [his] personal beliefs," but he did make this proclamation (repeatedly) about Davis. *Id.* at PgID.754, 756-757. Gov. Beshear did not instruct Atty. Gen. Conway that "if you are at that point to where your personal convictions tell you that you simply cannot fulfill your duties that you were elected to do, than [*sic*] obviously the honorable course to take is to resign and let someone else step-in who feels that they can fulfill these duties," but he did issue this instruction to Davis. *Id.* Gov. Beshear did not ominously declare that "[t]he courts and voters will deal appropriately with" Atty. Gen. Conway, but he did so declare with respect to Davis. *Id.* at PgID.754, 756-757. Thus, although Atty Gen. Conway was given a pass for his conscience about marriage without any threats of repercussion, Davis has been repeatedly told by Gov. Beshear to abandon her religiously-informed beliefs or resign. There is no

67

compelling reason, let alone an interest "of the highest order," *Lukumi*, 508 U.S. at 546, to impose this choice on Davis.

### b.    Many Less Restrictive Alternatives Are Available.

Even if the requisite compelling governmental interest can be shown, the infringement upon Davis' religious freedom must still satisfy the "exceptionally demanding" least-restrictive-means standard. *Hobby Lobby*, 134 S.Ct. at 2780. No one has demonstrated that Kentucky "lacks other means" of issuing marriage licenses to same-sex couples "without imposing a substantial burden" on Davis' "exercise of religion." *Id*. Not only that, but the least-restrictive-means test may "require the Government to expend additional funds" to accommodate "religious beliefs," *id.* at 2781. This is consistent with the fiscal impact reports provided to Kentucky legislators prior to enacting the Kentucky RFRA, which noted that the least restrictive alternative requirements "may be minimal . . . or significant, for example, if it requires hiring additional staff or paying overtime for other staff to do a job that an employee declines to do because of religious beliefs." R.39-5, KYLRC Fiscal Impact Estimates for Kentucky RFRA, PgID.1120-1123. Thus, even if proposed less restrictive alternatives require additional costs in applying Kentucky marriage law, such costs are specifically envisioned and accepted by the Kentucky RFRA to ensure the protection of religious freedom.

In this matter, even if the "desired goal" is providing Plaintiffs with Kentucky marriage licenses **in Rowan County**, *Hobby Lobby*, 134 S.Ct. at 2780, **numerous less restrictive means are available** to accomplish it (including the current status quo) without substantially burdening Davis' religious freedom and conscience or Plaintiffs, such as:

- Providing an opt-out or exemption to the Kentucky marriage licensing scheme (as exists for the Kentucky fish and wildlife licensing scheme, KY. REV. STAT. § 150.195), and as other states, such as North Carolina, have enacted, *see*, *e.g.*, N.C. GEN. STAT. § 51-5.5 (permitting recusal of officials from "issuing" marriage licenses "based upon any sincerely held religious objection").

- Deputizing a neighboring county clerk (or some other person) to issue Kentucky marriage licenses in Rowan County.

- Modifying the prescribed Kentucky marriage license form to remove the multiple references to Davis' name and other personal identifiers, and thus to remove the personal nature of the authorization that Davis must provide on the current form.

- Deeming Davis "absent" for purposes of issuing SSM licenses, based upon her moral and religious inability to issue them, and allowing those licenses to be issued by the Rowan County Judge/Executive who has

no conscience objection to issuing said licenses, as specifically authorized by Kentucky law, KY. REV. STAT. § 402.240; *see also* R.26, Prelim. Inj. Hr'g (7/20/2015), Blevins Testimony, PgID.224-225, 230.

- Distributing Kentucky marriage licenses at the state-level through an online or other statewide licensing scheme, such as through the Department of Vital Statistics.

- Issuing an executive order on marriage licensing that accommodates individual county clerks' religious objections, which can then be ratified by the Kentucky Legislature, KY. REV. STAT. § 12.028.

- Legislatively addressing Kentucky's entire marriage licensing scheme post-*Obergefell*, whether immediately by calling a special legislative session or in the next regular legislative session beginning in January 2016.

All of the foregoing options, and others, are available to avoid substantially burdening Davis' religious beliefs in the wake of the redefinition of marriage in *Obergefell*. But Gov. Beshear appears not to have evaluated, let alone even considered, any of the foregoing less restrictive alternatives before issuing his SSM Mandate. Government's failure to actually "consider[] and reject[] alternatives more tailored" to its alleged interests "cannot withstand" the least restrictive means test. *Haight*, 763 F.3d at 564. Gov. Beshear issued his SSM Mandate to all Kentucky

70

county clerks on June 26, 2015—the same day the *Obergefell* decision was announced. But tecognizing SSM and protecting county clerks' religious conscience rights in Kentucky's marriage licensing scheme are not mutually exclusive results. Gov. Beshear has publicly stated that there are a "number of different ways" to change marriage licensing to achieve both. R.70-1, Memo. Supp. Inj. Pending Appeal, PgID.1525. This statement debunks any compelling governmental interest in forcing Davis to violate her conscience, and serves as an admission that there are a number of available options for addressing marriage licenses in a way that alleviates Davis' religious liberty concerns—one of which is currently now in place in Rowan County.

Since September 14, 2015, when Davis returned to work after spending six days in jail, marriage licenses are being issued in the Rowan County clerk's office to lawfully eligible couples that both accommodate Davis' religious objections and are validated and recognized by the highest elected officials in Kentucky, Gov. Beshear and Atty. Gen. Conway. These licenses were altered to remove Davis' name, other personal identifiers, and her personal authorization. R.120-1, Marriage License, PgID.2326. Gov. Beshear expressly approved of such alterations (which accommodate Davis' sincerely-held religious beliefs and conscience) when he unambiguously stated that these licenses "substantially comply with the law in Kentucky . . . And they're going to be recognized as valid in the Commonwealth."

R.133, Resp. Pls.' Mot. Enforce, PgID.2489-2495. Gov. Beshear's express approval

demonstrates that religious accommodation is (and always was) possible.

### C. Public Interest Favors Protection Of First Amendment Rights Generally And Interim Religious Accommodation For Davis Under The Circumstances Of This Case.

When it comes to the "protection of First Amendment liberties," the public

has a "significant interest." *Dayton Area Visually Impaired Persons, Inc. v. Fisher*,

70 F.3d 1474, 1490 (6th Cir. 1995). The public has no interest in coercing Davis to

irreversibly violate her conscience when ample less restrictive alternatives are

readily available. *O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389

F.3d 973, 1010 (10th Cir. 2004) ("[P]ursuant to RFRA, there is a strong public

interest in the free exercise of religion even where that interest may conflict with

[another legislative scheme].").

Moreover, the Injunction significantly changed the relative position of the

parties and, in fact, completely altered (prematurely) the status quo then existing

between the parties at a time when there was ongoing public debate in Kentucky

between the SSM Mandate and religious liberty. *S. Milk Sales, Inc. v. Martin*, 924

F.2d 98, 102 (6th Cir. 1991) (an essential purpose of a preliminary injunction is "to

preserve the relative positions of the parties until a trial on the merits can be held")

(internal quotation and citation omitted). Prudence and caution further support

reversal of the Injunction because Kentucky's political branches have indicated an

intent to address this matter with a legislative solution, and multiple bills addressing marriage post-*Obergefell* have been pre-filed for the next legislative session. A legislative response in Kentucky would not be the first of its kind to protect religious freedom. *See*, *e.g.*, N.C. GEN. STAT. § 51-5.5; UTAH S.B. 297 (2015 Gen. Sess.). Also, multiple Governors have issued executive orders to further protect the religious conscience of certain individuals as it relates to marriage.[17] These responses are not uniform, but they show public interest supports religious accommodation.

## II.    The District Court Erred In Practically Denying Davis' Request For Preliminary Injunctive Relief Against The State Defendants.

Based upon the same analysis set forth in Section I.B, *supra*, Davis established grounds for a likelihood of success on the merits of her claims for injunctive relief against the State Defendants in the form of a religious accommodation from the SSM Mandate, the public interest supporting such accommodation, and the lack of substantial harm to others. There is likewise no harm to the State Defendants in granting Davis' requested injunctive relief, as shown by recent events whereby Davis has effectively been granted the simple religious accommodation she has requested from the beginning of this litigation. *See* pages 26, 71-72, *supra* (discussing current status quo regarding marriage licenses in Rowan County).

---

[17]    *See*, *e.g.*, La. Gov. Executive Order, BJ 15-8, Marriage and Conscience Order, at § 2 (May 19, 2015).

73

Furthermore, the accommodation Davis seeks through an injunction against the State Defendants is not barred by sovereign immunity under the Eleventh Amendment. Federal constitutional claims seeking prospective or declaratory relief against state officials in their official capacity are not barred by state sovereign immunity under the *Ex Parte Young*, 209 U.S. 123 (1908), exception. *Cady v. Arenac Cnty.*, 574 F.3d 334, 344 (6th Cir. 2009).

Additionally, sovereign immunity does not preclude state law claims based upon violations of state statutes that compel nondiscretionary duties, as are involved here, pursuant to the Fourteenth Amendment's Due Process Clause. The Kentucky RFRA, on which Davis' claims against the State Defendants rest, mandates an analysis for all government action, and is not discretionary in its terms. KY. REV. STAT. § 446.350 ("Government **shall not** substantially burden a person's freedom of religion.") (emphasis added). As such, the Kentucky RFRA creates a liberty interest protected by the Fourteenth Amendment's Due Process Clause and thus a violation of it constitutes an unconstitutional denial of liberty without due process. *Spruyette v. Walters*, 753 F.2d 498, 506 (6th Cir. 1985); *see also Jackson v. Ylst*, 921 F.2d 882, 886 (9th Cir. 1990); *Kalosho v. Kapture*, 868 F. Supp. 882, 889 (E.D. Mich. 1994) (state statutes provide protected liberty interests if they contain mandatory terms such as "shall" or "will"). Accordingly, the district court should

not have refused a religious accommodation for Davis and should not have denied her motion for preliminary injunction against the State Defendants.[18]

## III.  The District Court Erred In Granting The September 3, 2015 Expanded Injunction Against Davis.

### A.  The District Court Had No Jurisdiction To Expand The Original Injunction While It Was On Appeal To This Court.

The filing of a notice of appeal is a point of "jurisdictional significance," conferring jurisdiction on the appellate court and divesting the district court of same. *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). Under well-established precedent from this Court, the district court had no jurisdiction to enter the Expanded Injunction while the original Injunction was on appeal.

"[A] a district court may not alter or enlarge the scope of its judgment pending appeal . . . ." *N.L.R.B. v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 588 (6th Cir. 1987). "The standard for jurisdiction after the filing of the notice of appeal . . . is that a district court may enforce its judgment **but not expand upon it**." *Am. Town Ctr. v. Hall 83 Assocs.*, 912 F.2d 104, 110-11 (6th Cir. 1990) (emphasis added); *see also U.S. v. State of Mich.*, Nos. 94-2391, 95-1258, 1995 WL 469430, at *18 (6th Cir. 1995); *City of Cookeville, Tenn. v. Upper Cumberland Elec. Membership Corp.*, 484

---

[18]    As the discussion and authorities on page 4, *supra*, demonstrate, and as a motions panel of this Court already found, the district court's decision to indefinitely stay Davis' motion for a preliminary injunction amounted to a "practical denial" of injunctive relief, which is immediately reviewable by this Court.

F.3d 380, 388 (6th Cir. 2007) ("The district court did not have jurisdiction to issue the injunction because the injunction sought to expand the district court's previous order."). Any amendment of an order without jurisdiction is a "nullity." *Workman v. Tate*, 958 F.2d 164, 168 (6th Cir. 1992) ("Since the district court was without jurisdiction to amend its order . . . the Amended Order . . . is a nullity."); *U.S. v. Holloway*, 740 F.2d 1373, 1382 (6th Cir. 1984) ("In the present case, the district court's order is 'null and void since that court was without jurisdiction . . . after the appeal had been taken.'") (citation omitted).

This Court has drawn a crucial distinction between **expansion** (or enlargement) of orders, including injunctions, and **enforcement** of them. *Cookeville*, 484 F.3d at 394 (citing *Am. Town Ctr.*, 912 F.2d at 110). Thus, nothing in Federal Rule of Civil Procedure 62(c) (which Plaintiffs cited in their thinly-veiled motion to "clarify," and the district court cited in its order granting the Expanded Injunction) permits an expansion or enlargement of an injunction order on appeal. In this matter, the district court did not "modify" its original Injunction. Instead, by its own words, it significantly "expanded" the Injunction and provided relief that Plaintiffs did not originally request, and the district court did not originally grant. R.78, Contempt Hr'g (9/3/2015), PgID.1578 (explicitly recognizing that the so-called "clarification" sought by Plaintiffs was, in fact, to add relief to the Injunction which Plaintiffs "**did not request**" in their motion for preliminary injunction) (emphasis added); R.103,

76

Order (9/11/2015), PgID.2177 (expressly acknowledging that it had "**expanded its
ruling** to include other individuals who are legally eligible to marry in Kentucky")
(emphasis added). Plaintiffs cannot escape these express acknowledgments, which
unequivocally demonstrate that the district court had no jurisdiction to enter the
Expanded Injunction.

The district court's more recent attempt to move away from its prior
descriptions, and to simply re-characterize the Expanded Injunction as a "modified"
injunction, does not change what the district court, in fact, did in granting the
Expanded Injunction. R.121, Order (9/23/2015), PgID.2329-2333. The district
court's contemporaneous statements belie any notion that it merely "modified" or
"clarified" the Injunction. *Id.* at PgID.2329, 2332.

Plaintiffs' motion for preliminary injunction expressly, and only, sought to
enjoin Davis to issue licenses to the "**Named Plaintiffs**." R.2, Pls.' Mot. Prelim. Inj.,
PgID.34 (emphasis added); R.2-2, Proposed Prelim. Inj. Order, PgID.48. The
resulting Injunction enjoined Davis to issue licenses, expressly and only, to the
"Plaintiffs." R.43, Inj., PgID.1173. The scope of the Injunction could not be clearer.
There is no "confusion as to the Order's scope," as Plaintiffs creatively alleged in
their thinly-veiled motion to "clarify." R.68, Pls.' Mot. "Clarify" Prelim. Inj.,
PgID.1489. Thus, expanding the class of persons entitled to licenses pursuant to the
Injunction—to include anyone in the world who wants a marriage license in Rowan

County—can in no way be described as a clarification. The expansion of the class is an expansion of the Injunction, which the district court had no jurisdiction to do. Thus, the Expanded Injunction is a nullity, and should be reversed.

### B. The District Court Violated Davis' Due Process Rights By Granting A New Injunction Without More Than Same-Day Notice.

Entering the Expanded Injunction without notice also violated Davis' due process rights. In advance of the September 3, 2015 **contempt** hearing, the district court provided no notice that it would significantly expand and alter its Injunction at the contempt hearing **without taking any evidence**, while the Injunction was already on appeal, and then confine Davis to prison based upon the *ultra vires* Expanded Injunction.

The Federal Rules of Civil Procedure state that "[t]he court may issue a preliminary injunction only on notice to the adverse party," Fed. R. Civ. P. 65(a)(1), and that "[a] written motion and notice of the hearing must be served at least 14 days before the time specified for the hearing." Fed. R. Civ. P. 6(c). The Local Rules of the Eastern District of Kentucky do not alter these requirements. "'[C]ourts have not hesitated to dissolve a preliminary injunction issued without sufficient notice or opportunity to contest issues of fact or of law.'" *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 246 (6th Cir. 2011) (citation omitted). "Same-day" notice "does not suffice" for the granting of injunctive relief. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*,

415 U.S. 423, 432 n.7 (1974). Because the Expanded Injunction was entered without more than same-day notice, the district court provided insufficient notice and thus violated Davis' due process rights.

## IV.    The District Court Committed An Abuse Of Discretion In Its September 3, 2015 Contempt Order.

The contempt power is uniquely "liable to abuse," *Bloom v. Illinois*, 391 U.S. 194, 202 (1968) (citation omitted), for contempt proceedings "leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994). Alleged contempt "'often strikes at the most vulnerable and human qualities of a judge's temperament,' and its fusion of legislative, executive, and judicial powers 'summons forth . . . the prospect of 'the most tyrannical licentiousness.'" *Id.* (internal citations omitted). The exercise of contempt is a "delicate one," and "care is needed to avoid arbitrary or oppressive conclusions." *Cooke v. U.S.*, 267 U.S. 517, 539 (1925). The Supreme Court has cautioned that only "'[t]he least possible power adequate to the end proposed' should be used in contempt cases." *U.S. v. Wilson*, 421 U.S. 309, 319 (1975) (citation omitted). These foregoing concerns are on display in the district court's overreaching Contempt Order which should be reversed.

Further, Davis' release from incarceration did not moot her appeal of the Contempt Order. The abuses committed by the district court exhibit wrongs that are

capable of repetition yet evading review and also subject Davis to continuing adverse collateral consequences, including, *inter alia*, the ongoing personal stain of having been found in contempt and having to acknowledge that fact even though the order never should have passed.

## A.    Reversal Of The Injunction Warrants Reversal Of The Contempt Order.

The Contempt Order should be reversed because the Injunction should be reversed, and therefore, the contempt decree tied to that Injunction "never should have passed." *Garrison v. Cassens*, 334 F.3d 528, 543 (6th Cir. 2003) (quoting *Blaylock*, 547 F.2d at 966); *see also U.S. v. United Mine Workers of Am.*, 330 U.S. 258, 294-95 (1947) ("The right to remedial relief falls with an injunction which events prove was erroneously issued . . . .").

## B.    The Contempt Order Eviscerated Davis' Constitutional Due Process Rights.

The district court's fast-tracked contempt proceeding and preconceived Contempt Order violated Davis' due process rights, irrespective of whether the contempt is deemed civil or criminal.[19] Because criminal contempt is a crime,

---

[19]    Determining whether a contempt is civil or criminal depends on the "character and purpose" of the sanction imposed by a court. *Bagwell*, 512 U.S. at 827 (citing *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911)). A contempt sanction is considered civil if it "is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court." *Id.*

"'criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings,'" including, *inter alia*, a right to a jury trial, proof beyond a reasonable doubt, and proof of criminal intent. *Bagwell*, 512 U.S. at 826-27 (citations omitted). Even civil contempt proceedings must also include "procedural safeguards afforded by the due process clause." *Cincinnati Bronze*, 829 F.2d at 589; *see also Consolidation Coal Co. v. Local Union No. 1784*, 514 F.2d 763, 765 (6th Cir. 1975).

Even though the district court rejected notions that it was holding a criminal proceeding, R.78, Contempt Hr'g (9/3/2015), PgID.1596, 1610, 1654, 1656, 1715, at the very outset of the contempt hearing, and throughout, the district court repeatedly cited the criminal contempt section (18 U.S.C. § 401) as the authority for its contempt proceeding, *id.* at PgID.1568, 1595, 1657-58. The district court had pre-arranged for each of the six deputy clerks of the Rowan County clerk's office to be appointed a federal public defender under the federal **Criminal** Justice Act. *Id.* at PgID.1667, 1673.

Furthermore, the district court stated that "at its very core, the hearing is about compliance with the Court's orders." *Id.* at PgID.1667, 1723. But it was an emphasis on "compliance" without also determining that the licenses being ordered without Davis' authorization were even lawful. *Id.* at PgID.1724, 1728, 1731-32. The district court was committed to enforcing its order to punish Davis personally—only to

81

relinquish any responsibility regarding whether such licenses being ordered were valid. Any contempt sanction—and especially imprisonment—should not be handed down so flippantly. This calls into question statements that the district court intended only to issue a remedial order and coerce compliance (as in a civil contempt proceeding), and instead suggests that the district court sought to vindicate its own authority and punish Davis for past actions. Thus, Davis is entitled to heightened due process, which she plainly did not receive.

Even under lesser due process standards applicable to civil contempt proceedings, the district court still failed to provide requisite constitutional protections. Fundamentally, the district court provided **no notice** that it would significantly expand and alter its Injunction at the hearing, the merits of which were already on appeal, and then confine Davis to prison based upon this null and void newly expanded injunction. In no small measure, Davis walked into the courtroom on September 3, 2015 facing a contempt charge because **one** couple was denied a license after the temporary stay of the Injunction was lifted, but she left that courtroom in U.S. Marshal custody and subject to incarceration because the district court expanded the injunction to **everyone**. This act by the district court—taken without any notice and over Davis' objections, *id.* at PgID.1571, 1574-75—had the effect of placing Davis in confinement without keys for she had no more than same-day notice to comply with the Expanded Injunction.

82

The district court also **ordered incarceration** even though (1) Plaintiffs themselves had expressly disavowed that remedy, R.67, Contempt Mot., PgID.1483; (2) Davis had a pending motion to dismiss Plaintiffs' Complaint in its entirety (which is still pending); (3) the original Injunction was entered in large part based upon evidence at a hearing that occurred before Davis was even served with the Complaint; (4) Davis had multiple appeals pending before this Court on the merits of the underlying claims and defenses; and (5) numerous less restrictive and less intrusive measures were available. But the district court refused to consider this history and relevant procedural safeguards, including Davis' pending substantive challenges, before abrogating Davis' due process rights and fast-tracking her for contempt and the most severe of sanctions significantly depriving her of her personal liberty. *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *Addington v. Texas*, 441 U.S. 418, 425 (1979). Thus, whether the Contempt Order is civil or criminal, Davis was not afforded appropriate due process.

### C.    The District Court's Contempt Order Erroneously Discarded Davis' Rights Under The Federal RFRA.

The Contempt Order also violated the Federal RFRA. The Federal RFRA provides that: "Government [defined to include any "branch" or "official" of the United States] shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of

a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb-1(a) & (b), 2000bb-2. The Federal RFRA was designed to protect religious liberty "far beyond what [the Supreme] Court has held is constitutionally required." *Hobby Lobby*, 134 S.Ct. at 2767. Significantly, Federal RFRA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" and "mandate[s] that this concept be construed in favor of a broad protection of religious exercise." *Id.* at 2762 (internal quotation and citation omitted). Federal RFRA may be asserted "as a claim or a defense in a judicial proceeding," 42 U.S.C. § 2000bb-1(c), **including contempt proceedings**. *Ali*, 682 F.3d at 709-11 (vacating contempt sanction by federal judge for failure to evaluate whether court order violated RFRA).

As noted above, and confirmed during the contempt proceeding, there is no dispute that Davis possesses the requisite "honest conviction" and sincerely-held beliefs about marriage. R.78, Contempt Hr'g (9/3/2015), PgID.1648-50. At the contempt hearing, Davis was threatened by contempt sanctions—**ongoing imprisonment**. Thus, by imprisoning Davis and threatening to hold her hostage indefinitely as a prisoner of her conscience, the district court imposed direct pressure and a substantial burden on Davis, forcing her to choose between her religious beliefs and forfeiting her essential personal freedom on the one hand, or abandoning those beliefs to keep her freedom on the other hand. *See Hobby Lobby*, 134 S.Ct. at

84

2778-79. This unfair choice placed undue and substantial pressure on Davis to choose between her livelihood and her religion, her freedom from imprisonment and her sincere convictions. Notwithstanding, the district court conducted no Federal RFRA-analysis, and instead simply referred to its prior error-laden substantial burden analysis under the Kentucky RFRA in connection with the underlying Injunction. Although Davis' sincerity was unchanged, the circumstances were different, and the pressure being exerted was even greater. Moreover, Davis' religious freedom claims were now based upon the Federal RFRA, rather than the Kentucky RFRA, because the context was a contempt proceeding in federal court. For the same reasons set forth above in Section II.B.3, *supra*, the district court's conclusion that no substantial burden is presented here is wrong (an error that is only magnified further when the choice is between one's religion and jail) and plainly violates Supreme Court and Sixth Circuit precedent.

Moreover, there is no compelling government interest to punish Davis for contempt, and imprison her conscience when her reasonable accommodation request was pending and not decided. Because of the widespread availability of marriage licenses in Kentucky and the Kentucky Legislature's stated intent to provide religious accommodations, there was no clear reason why the district court could not hold any contempt sanction in abeyance until the Kentucky Legislature met. Moreover, any governmental interest is undermined by the district court's refusal to

85

determine whether the marriage licenses it forced to be issued over Davis' objection and without her authorization were even valid under Kentucky law.

But even if the requisite showing of a compelling government interest can be made in the contempt proceeding, the infringement upon Davis' religious liberty at this stage similarly fails the "exceptionally demanding" least-restrictive-means standard. *Hobby Lobby*, 134 S.Ct. at 2780. The district court did not consider, let alone demonstrate, that it "lack[ed] other means" of enforcement "without imposing a substantial burden" on Davis' "exercise of religion," by incarcerating her. *Id.* Also, the least-restrictive means test may "require the Government to expend additional funds" to accommodate "religious beliefs." *Id.* at 2781. Because the Federal RFRA applies to contempt proceedings in federal court, and the district court failed to conduct a strict scrutiny analysis, the Contempt Order should be vacated.

**D.    The District Court Unconstitutionally Commandeered The Province And Affairs Of A State Office Run By A Publicly Elected Official.**

Furthermore, the Contempt Order rejects established principles of federalism and comity by usurping the role of a publicly elected official in Kentucky and invading the province, discretion, and affairs of that official's office. In devising remedies, federal courts are to "take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Milliken v. Bradley*, 433 U.S. 267, 280-81 (1977). It is incumbent upon federal district courts

86

that sanctions imposed against state officials should be the "least intrusive" remedy available. *Kendrick v. Bland*, 740 F.2d 432, 437-38 (6th Cir. 1984); *Spallone v. U.S.*, 493 U.S. 265, 276 (1990).

Ignoring appropriate considerations of federalism, the district court ordered the immediate and ongoing incarceration of Davis, a far greater intrusion than any fine. *Hutto v. Finney*, 437 U.S. 678, 691 (1978) (fines are less intrusive than imprisonment). Then, without permitting any time to allow this most powerful sanction to have any effect on Davis' compliance with the Injunction, the district court hastily proceeded to prosecute her deputy clerks (all non-parties who voluntarily appeared at the contempt proceeding) through a one-by-one inquisition on whether each of them will implement the Injunction after they just watched their boss, Davis, be remanded indefinitely to federal custody. R.78, Contempt Hr'g (9/3/2015), PgID.1667-1736.

By imprisoning Davis, the district court effectively removed the public officeholder from her office, even though (1) she is a publicly elected official who can be removed from her office only through a state-based impeachment process, KY. CONST. §§ 66-68; (2) marriage licensing constituted a quantitatively small part of the Rowan County clerk's office pre-*Obergefell* business—approximately one-tenth of one percent of the county clerk's office receipts, and, if handled by only one person, would only take about 1 hour of their week, R.26, Prelim. Inj. Hr'g

87

(7/20/2015), Davis Testimony, PgID.242-244; (3) the Rowan County clerk's office is closed more than 100 days per year so marriage licenses cannot even be issued those days; and (4) leading Kentucky legislators from both parties in both houses uniformly agree that Davis' religious beliefs should be protected, and both gubernatorial candidates in Kentucky have indicated support for a legislative solution that protects county clerks' individual rights, R.72, Resp. Pls.' Contempt Mot., PgID.1544-1545 (citing sources). In fact, Kentucky's Senate President asked the district court specifically to withhold contempt because "the provisions governing the issuance of marriage licenses in Kentucky have been, for the most part, judicially repealed by *Obergefell* and [Davis] cannot be reasonably expected to determine her duties until such time as either the Governor by Executive Order or the General Assembly by legislation provides guidance and clarification." R.73, Stivers Amicus, PgID.1548. Such prudence and caution—which is particularly appropriate when dealing with a duly elected public servant in Kentucky—were set aside by the district court in its hurried quest to vindicate its own authority. Finally, the district court's practical annexation of the Rowan County clerk's office was even more unwarranted considering the uncertainty of whether the marriage licenses ordered to be issued over Davis' objection and without her authorization were even valid under Kentucky law.

## CONCLUSION

For all the foregoing reasons, Appellant Kim Davis respectfully requests that this Court reverse (1) the district court's August 12, 2015 preliminary injunction against Davis, (2) the district court's August 25, 2015 order practically denying a preliminary injunction against the State Defendants, (3) the district court's September 3, 2015 expanded injunction against Davis, and (4) the district court's September 3, 2015 contempt order against Davis.

DATED: November 2, 2015

Respectfully submitted:

/s/ Jonathan D. Christman

A.C. Donahue
DONAHUE LAW GROUP, P.S.C.
P.O. Box 659
Somerset, Kentucky 42502
(606) 677-2741
ACDonahue@DonahueLawGroup.com

Mathew D. Staver, *Counsel of Record*
Horatio G. Mihet
Roger K. Gannam
Jonathan D. Christman
LIBERTY COUNSEL
P.O. Box 540774
Orlando, Florida 32854
(407) 875-1776
court@lc.org / hmihet@lc.org /
rgannam@lc.org / jchristman@lc.org

*Counsel for Appellant Kim Davis*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), as modified by the Court's order dated October 1, 2015 (Doc 54-1), because it contains 20,995 words, as determined by the word-count function of Microsoft Word 2013, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and this Court's Rule 32(b)(1).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

Dated: November 2, 2015                 /s/ Jonathan D. Christman
                                        Jonathan D. Christman
                                        LIBERTY COUNSEL
                                        P.O. Box 540774
                                        Orlando, Florida 32854
                                        (407) 875-1776
                                        jchristman@lc.org

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Dkt. No. | Description of Document | PgID No. |
|---|---|---|
| 1 | Plaintiffs' Complaint with Exhibits | 1 |
| 2 | Plaintiffs' Motion for Preliminary Injunction | 34 |
| 5 | Order Setting Preliminary Injunction Hearing | 56 |
| 10 | District Court's Minute Entry Order regarding Preliminary Injunction Hearing (7/13/2015) | 77 |
| 16 | Witness List for Preliminary Injunction Hearing (7/13/2015) | 86 |
| 18 | Order Setting Preliminary Injunction Hearing | 92 |
| 19 | Executed Summons on Davis dated July 14, 2015 | 93 |
| 21 | Preliminary Injunction Hearing Transcript (7/13/2015) | 100 |
| 24 | District Court's Minute Entry Order regarding Preliminary Injunction Hearing (7/20/2015) | 215 |
| 25 | Witness List for Preliminary Injunction Hearing (7/20/2015) | 216 |
| 26 | Preliminary Injunction Hearing Transcript (7/20/2015) | 217 |
| 29 | Davis' Response in Opposition to Plaintiffs' Motion for Preliminary Injunction | 318 |
| 31 | Plaintiffs' Motion for Class Certification | 648 |
| 32 | Davis' Motion to Dismiss Plaintiffs' Complaint | 663 |
| 34 | Davis' Verified Third-Party Complaint with Exhibits | 745 |
| 36 | Plaintiffs' Reply Brief in Support of Motion for Preliminary Injunction | 797 |
| 39 | Davis' Motion for Preliminary Injunction | 824 |
| 41 | District Court's Minute Entry Order regarding Preliminary Injunction Hearing (8/10/2015) | 1133 |
| 42 | Davis' Motion for Extension of Time to File Response to Plaintiffs' Motion for Class Certification | 1134 |
| 43 | District Court's August 12, 2015 Memorandum Opinion and Order Granting Plaintiffs' Motion for Preliminary Injunction | 1146 |
| 44 | Notice of Appeal of District Court's August 12, 2015 Preliminary Injunction Order | 1174 |
| 45 | Davis' Motion to Stay District Court's August 12, 2015 Preliminary Injunction Order | 1207 |

| 46 | Plaintiffs' Response in Opposition to Davis' Motion to Stay District Court's August 12, 2015 Preliminary Injunction Order | 1234 |
|----|----|----|
| 51 | Davis' Reply Brief in Support of Motion to Stay District Court's August 12, 2015 Preliminary Injunction Order | 1255 |
| 52 | District Court's August 17, 2015 Order Denying Motion to Stay August 12, 2015 Preliminary Injunction Order Pending Appeal But Granting Temporary Stay To Seek Sixth Circuit Review | 1264 |
| 54 | Preliminary Injunction Hearing Transcript (8/10/2015) | 1273 |
| 55 | District Court's August 19, 2015 Order Setting An Expiration Date on Temporary Stay of August 12, 2015 Preliminary Injunction Order | 1283 |
| 56 | Davis' Reply Brief in Support of Motion for Extension of Time to File Response to Plaintiffs' Motion for Class Certification | 1285 |
| 57 | District Court's August 25, 2015 Virtual Order Granting Davis' Motion for Extension of Time to File Response to Plaintiffs' Motion for Class Certification | See Docket |
| 58 | District Court's August 25, 2015 Order Staying Briefing on Davis' Motion to Dismiss Plaintiffs' Complaint and Davis' Motion for Preliminary Injunction | 1289 |
| 62 | Davis' Motion to Extend Temporary Stay | 1297 |
| 63 | Plaintiffs' Response in Opposition to Motion to Extend Temporary Stay | 1302 |
| 64 | Davis' Reply Brief in Support of Motion to Extend Temporary Stay | 1325 |
| 65 | District Court's August 28, 2015 Virtual Order Denying Davis' Motion to Extend Temporary Stay | See Docket |
| 66 | Notice of Appeal of District Court's August 25, 2015 Order Staying Briefing on Davis' Motion to Dismiss Plaintiffs' Complaint and Davis' Motion for Preliminary Injunction | 1471 |
| 67 | Plaintiffs' Motion to Hold Davis in Contempt | 1477 |
| 68 | Plaintiffs' Motion to "Clarify" District Court's August 12, 2015 Preliminary Injunction Order | 1488 |

| 69 | District Court's Minute Entry Order regarding Scheduling Conference (9/1/2015) | 1496 |
|---|---|---|
| 70 | Davis' Motion for Injunction Pending Appeal | 1498 |
| 71 | Scheduling Conference Transcript (9/1/2015) | 1534 |
| 72 | Davis' Response in Opposition to Plaintiffs' Motion to Hold Davis in Contempt | 1540 |
| 73 | Motion for Leave to File Amicus Brief by Kentucky Senate President Robert Stivers | 1547 |
| 74 | District Court's September 3, 2015 Order Granting Plaintiffs' Motion to "Clarify" District Court's August 12, 2015 Preliminary Injunction Order | 1557 |
| 75 | District Court's September 3, 2015 Order Granting Plaintiffs' Motion to Hold Davis in Contempt | 1558 |
| 76 | Witness List for Contempt Hearing (9/3/2015) | 1560 |
| 78 | Contempt Hearing Transcript (9/3/2015) | 1563 |
| 82 | Notice of Appeal of District Court's September 3, 2015 Order Granting Plaintiffs' Motion to "Clarify" District Court's August 12, 2015 Preliminary Injunction Order | 1785 |
| 83 | Notice of Appeal of District Court's September 3, 2015 Order Granting Plaintiffs' Motion to Hold Davis in Contempt | 1791 |
| 84 | Plaintiffs' Status Report | 1798 |
| 89 | District Court's September 8, 2015 Release Order | 1827 |
| 91 | Third-Party Defendants' Response in Opposition to Davis' Motion for Injunction Pending Appeal | 1829 |
| 92 | Third-Party Defendants' Motion to Dismiss Davis' Third-Party Complaint | 1845 |
| 97 | Davis' Reply Brief in Support of Motion for Injunction Pending Appeal | 1901 |
| 103 | District Court's September 11, 2015 Order Denying Davis' Motion for Injunction Pending Appeal | 2175 |
| 106 | CJA Appointment Form for Deputy Clerk Nathaniel Davis | 2189 |
| 107 | CJA Appointment Form for Deputy Clerk Kristy Plank | 2190 |
| 108 | CJA Appointment Form for Deputy Clerk Brian Mason | 2191 |
| 109 | CJA Appointment Form for Deputy Clerk Kim Russell | 2192 |
| 110 | CJA Appointment Form for Deputy Clerk Melissa Thompson | 2193 |

| 111 | CJA Appointment Form for Deputy Clerk Roberta Earley | 2194 |
|---|---|---|
| 113 | Davis' Motion to Stay District Court's September 3, 2015 Order Granting Plaintiffs' Motion to "Clarify" District Court's August 12, 2015 Preliminary Injunction Order Pending Appeal | 2200 |
| 114 | Status Report by Deputy Clerk Brian Mason | 2293 |
| 115 | Plaintiffs' Motion to Reopen Briefing and Expedite Consideration of Plaintiffs' Motion for Class Certification | 2296 |
| 116 | Status Report by Deputy Clerk Kim Russell | 2304 |
| 117 | Status Report by Deputy Clerk Melissa Thompson | 2306 |
| 118 | Status Report by Deputy Clerk Kristy Plank | 2308 |
| 119 | Status Report by Deputy Clerk Roberta Earley | 2310 |
| 120 | Plaintiffs' Motion to Enforce September 3 and September 8 Orders | 2312 |
| 121 | District Court's September 23, 2015 Order Denying Davis' Motion to Stay District Court's September 3, 2015 Order Granting Plaintiffs' Motion to "Clarify" District Court's August 12, 2015 Preliminary Injunction Order Pending Appeal | 2329 |
| 122 | Amended Status Report by Deputy Clerk Roberta Earley | 2334 |
| 123 | Davis' Response in Opposition to Third-Party Defendants' Motion to Dismiss Davis' Third-Party Complaint | 2336 |
| 124 | Third-Party Defendants' Reply Brief in Support of Motion to Dismiss Davis' Third-Party Complaint | 2385 |
| 125 | Status Report by Deputy Clerk Kim Russell | 2439 |
| 126 | Status Report by Deputy Clerk Melissa Thompson | 2440 |
| 127 | Status Report by Deputy Clerk Kristy Plank | 2442 |
| 128 | Status Report by Deputy Clerk Kim Russell | 2444 |
| 129 | Status Report by Deputy Clerk Roberta Earley | 2445 |
| 130 | District Court's October 6, 2015 Order Extending Due Dates for Deputy Clerk Status Reports | 2446 |
| 131 | Status Report by Deputy Clerk Brian Mason | 2447 |
| 132 | Davis' Response in Opposition to Plaintiffs' Motion to Reopen Briefing and Expedite Consideration of Plaintiffs' Motion for Class Certification | 2449 |

| 133 | Davis' Response in Opposition to Plaintiffs' Motion to Enforce September 3 and September 8 Orders | 2478 |
|---|---|---|
| 134 | Rowan County's Response in Opposition to Plaintiffs' Motion to Reopen Briefing and Expedite Consideration of Plaintiffs' Motion for Class Certification | 2513 |
| 135 | District Court's October 14, 2015 Order Directing Third-Party Defendants to Respond to Plaintiffs' Motion to Enforce September 3 and September 8 Orders | 2515 |
| 138 | Plaintiffs' Reply Brief in Support of Motion to Reopen Briefing and Expedite Consideration of Plaintiffs' Motion for Class Certification | 2522 |
| 139 | District Court's October 26, 2015 Order Denying Plaintiffs' Motion to Reopen Briefing and Expedite Consideration of Plaintiffs' Motion for Class Certification | 2530 |

## CONSTITUTIONAL AND STATUTORY PROVISIONS

**U.S. Constitution amend I**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**U.S. Constitution amend XIV, § 1**

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**Kentucky Constitution, § 1. Rights of life, liberty, worship, pursuit of safety and happiness, free speech, acquiring and protecting property, peaceable assembly, redress of grievances, bearing arms**

All men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned:

First: The right of enjoying and defending their lives and liberties.

Second: The right of worshipping Almighty God according to the dictates of their consciences.

Third: The right of seeking and pursuing their safety and happiness.

Fourth: The right of freely communicating their thoughts and opinions.

Fifth: The right of acquiring and protecting property.

Sixth: The right of assembling together in a peaceable manner for their common good, and of applying to those invested with the power of government for redress of grievances or other proper purposes, by petition, address or remonstrance.

Seventh: The right to bear arms in defense of themselves and of the State, subject to the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons.


**Kentucky Constitution, § 5. Right of religious freedom**

No preference shall ever be given by law to any religious sect, society or denomination; nor to any particular creed, mode of worship or system of ecclesiastical polity; nor shall any person be compelled to attend any place of worship, to contribute to the erection or maintenance of any such place, or to the salary or support of any minister of religion; nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed; and the civil

rights, privileges or capacities of no person shall be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching. No human authority shall, in any case whatever, control or interfere with the rights of conscience.

## Kentucky Constitution, § 233A. Valid or recognized marriage; Legal status of unmarried individuals

Only a marriage between one man and one woman shall be valid or recognized as a marriage in Kentucky. A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized.

## 42 U.S.C. § 2000bb-1. Free exercise of religion protected

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

    (1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

(c) Judicial relief

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

## 42 U.S.C. § 2000bb-2. Definitions

As used in this chapter--

(1) the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity;

(2) the term "covered entity" means the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States;

(3) the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion; and

(4) the term "exercise of religion" means religious exercise, as defined in section 2000cc-5 of this title.

## Kentucky Revised Statutes, § 402.005. Definition of marriage

As used and recognized in the law of the Commonwealth, "marriage" refers only to the civil status, condition, or relation of one (1) man and one (1) woman united in law for life, for the discharge to each other and the community of the duties legally incumbent upon those whose association is founded on the distinction of sex.

## Kentucky Revised Statutes, § 402.080. Marriage license required; who may issue

No marriage shall be solemnized without a license therefor. The license shall be issued by the clerk of the county in which the female resides at the time, unless the female is eighteen (18) years of age or over or a widow, and the license is issued on her application in person or by writing signed by her, in which case it may be issued by any county clerk.

**Kentucky Revised Statutes, § 402.100. Marriage license; marriage certificate; confidentiality of Social Security numbers**

Each county clerk shall use the form prescribed by the Department for Libraries and Archives when issuing a marriage license. This form shall provide for the entering of all of the information required in this section, and may also provide for the entering of additional information prescribed by the Department for Libraries and Archives. The form shall consist of:

(1) A marriage license which provides for the entering of: (a) An authorization statement of the county clerk issuing the license for any person or religious society authorized to perform marriage ceremonies to unite in marriage the persons named; (b) Vital information for each party, including the full name, date of birth, place of birth, race, condition (single, widowed, or divorced), number of previous marriages, occupation, current residence, relationship to the other party, and full names of parents; and (c) The date and place the license is issued, and the signature of the county clerk or deputy clerk issuing the license.

(2) A marriage certificate which provides for the entering of: (a) A statement by the person performing the marriage ceremony or the clerk of the religious society authorized to solemnize the marriage ceremony that the ceremony was performed. The statement shall include the name and title of the person performing the ceremony or the name of the religious society solemnizing the marriage, the names of persons

Add. 11

married, the date and place of the marriage, and the names of two (2) witnesses; (b) A statement by the person performing the marriage ceremony of his legal qualification under this chapter to perform the ceremony, such statement to include the name of the county or city where his license to perform marriage ceremonies was issued or, in the case of religious societies authorized by KRS 402.050(c) to solemnize marriages, the name of the city or county where the religious society is incorporated. The provisions of this paragraph shall not be construed to require the clerk of a religious society to be present at the marriage so long as the witnesses of the society are present; (c) A dated signature of the person performing the ceremony; and (d) A signed statement by the county clerk or a deputy county clerk of the county in which the marriage license was issued that the marriage certificate was recorded. The statement shall indicate the name of the county and the date the marriage certificate was recorded.

(3) A certificate to be delivered by the person performing the marriage ceremony or the clerk of the religious society performing the marriage ceremony to the parties married. This certificate shall provide for the entering of: (a) A statement by the person performing the marriage ceremony or the clerk of the religious society performing the marriage ceremony that the ceremony was performed. The statement shall include the name and title of the person performing the ceremony, or the name of the religious society performing the ceremony, the names of persons married, the

date and place of the marriage, the names of two (2) witnesses, and the following information as recorded on the license authorizing the marriage: the date the license was issued, the name of the county clerk under whose authority the license was issued, and the county in which the license was issued; and (b) A dated signature of the person performing the ceremony or the clerk of the religious society performing the ceremony.

(4) A Social Security number shall be requested as a means of identification of each party but shall not be recorded on the marriage license or certificate. Other means of identification may also be requested if a party does not have a Social Security number. The Social Security number shall be forwarded to the appropriate agency within the Cabinet for Health and Family Services that is responsible for enforcing child support, and the number shall be stored by that agency with a nonidentifying numeric. The Social Security number shall not be available for public release.

**Kentucky Revised Statutes, § 402.110. Marriage license to be uniform and completely filled out**

The form of marriage license prescribed in KRS 402.100 shall be uniform throughout this state, and every license blank shall contain the identical words and figures provided in the form prescribed by that section. In issuing the license the

clerk shall deliver it in its entirety to the licensee. The clerk shall see to it that every blank space required to be filled by the applicants is so filled before delivering it to the licensee.

## Kentucky Revised Statutes, § 402.230. Filing of marriage certificate; record of marriages

The certificate shall be filed in the county clerk's office. The county clerk shall keep in a record book a fair register of the parties' names, the person by whom, or the religious society by which, the marriage was solemnized, the date when the marriage was solemnized, and shall keep an index to the book in which the register is made.

## Kentucky Revised Statutes, § 402.240. County judge/executive to issue license in absence of clerk

In the absence of the county clerk, or during a vacancy in the office, the county judge/executive may issue the license and, in so doing, he shall perform the duties and incur all the responsibilities of the clerk. The county judge/executive shall return a memorandum thereof to the clerk, and the memorandum shall be recorded as if the license had been issued by the clerk.

**Kentucky Revised Statutes, § 402.990. Penalties**

(1) Any party to a marriage prohibited by KRS 402.010 shall be guilty of a Class B misdemeanor. If the parties continue after conviction to cohabit as man and wife, either or both of them shall be guilty of a Class A misdemeanor.

(2) Any person who aids or abets the marriage of any person who has been adjudged mentally disabled, or attempts to marry, or aids or abets any attempted marriage with any such person shall be guilty of a Class B misdemeanor.

(3) Any authorized person who knowingly solemnizes a marriage prohibited by this chapter shall be guilty of a Class A misdemeanor.

(4) Any unauthorized person who solemnizes a marriage under pretense of having authority, and any person who falsely personates the father, mother, or guardian of an applicant in obtaining a license shall be guilty of a Class D felony.

(5) Any person who falsely and fraudulently represents or personates another, and in such assumed character marries that person, shall be guilty of a Class D felony. Indictment under this subsection shall be found only upon complaint of the injured party and within two (2) years after the commission of the offense.

(6) Any clerk who knowingly issues a marriage license to any persons prohibited by this chapter from marrying shall be guilty of a Class A misdemeanor and removed from office by the judgment of the court in which he is convicted.

(7) Any clerk who knowingly issues a marriage license in violation of his duty under this chapter shall be guilty of a Class A misdemeanor.

(8) If any deputy clerk or any person other than a county clerk knowingly issues a marriage license in violation of this chapter, but not for a prohibited marriage, he shall be guilty of a Class A misdemeanor, and if he knowingly issues a license for a marriage prohibited by this chapter, he shall be guilty of a Class A misdemeanor.

(9) Any person who violates any of the provisions of KRS 402.090 shall be guilty of a violation.

(10) Any county clerk who violates any of the provisions of KRS 402.110 or 402.230 shall be guilty of a violation.

(11) Any person failing to make the return required of him by KRS 402.220 shall be guilty of a violation.


**Kentucky Revised Statutes, § 446.350. Prohibition upon government substantially burdening freedom of religion; showing of compelling governmental interest; description of "burden"**

Government shall not substantially burden a person's freedom of religion. The right to act or refuse to act in a manner motivated by a sincerely held religious belief may not be substantially burdened unless the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act

or refusal to act and has used the least restrictive means to further that interest. A "burden" shall include indirect burdens such as withholding benefits, assessing penalties, or an exclusion from programs or access to facilities.

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of November, 2015, I caused the foregoing document to be filed electronically with the Court, where it is available for viewing and downloading from the Court's ECF system, and that such electronic filing automatically generates a Notice of Electronic Filing constituting service of the filed document upon the following:

William Ellis Sharp
ACLU OF KENTUCKY
315 Guthrie Street, Suite 300
Louisville, KY 40202
sharp@aclu-ky.org

Daniel J. Canon
Laura E. Landenwich
Leonard Joe Dunman
CLAY DANIEL WALTON ADAMS, PLC
462 S. Fourth Street, Suite 101
Louisville, KY 40202
dan@justiceky.com
laura@justiceky.com
joe@justiceky.com

Daniel Mach
Heather L. Weaver
ACLU FOUNDATION
915 15th Street, NW, Suite 6th Floor
Washington, DC 20005
dmach@aclu.org
hweaver@aclu.org

James D. Esseks
Ria Tabacco Mar
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
jesseks@aclu.org
rmar@aclu.org

*Counsel for Appellees*

William M. Lear, Jr.
Palmer G. Vance II
STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, KY 40507-1380
william.lear@skofirm.com
gene.vance@skofirm.com

*Counsel for Third Party Defendants-Appellees*

/s/ Jonathan D. Christman
Jonathan D. Christman
LIBERTY COUNSEL
P.O. Box 540774
Orlando, Florida 32854
(407) 875-1776
jchristman@lc.org